THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JEFFREY WALTERS, Defendant-Appellant.

Second District No. 2—88—0106

Opinion filed July 28, 1989.—Rehearing denied September 27, 1989.

G. Joseph Weller and Kim M. DeWitt, both of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Colleen M. Griffin, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:

Following a jury trial, defendant, Jeffrey Walters, was found guilty of armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A—2), attempted armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 8—4(a)), and aggravated battery (Ill. Rev. Stat. 1987, ch. 38, par. 12—4(b)(1)). Defendant was sentenced to 17½ years on the armed violence con-

viction and to 8½ years for attempted armed robbery, both sentences to run concurrently. The court did not impose a sentence on the aggravated battery conviction. Defendant filed a timely notice of appeal.

On appeal, defendant contends that: (1) the trial court erred in denying his motion to suppress; (2) his aggravated battery conviction should be vacated; and (3) the trial court erred in failing to appoint independent counsel to review defendant's claim of ineffective assistance of counsel. We reverse and remand.

Joseph Imbrogno testified at trial that he was the owner of Pal Joey's Restaurant in West Chicago, Illinois. On February 4, 1987, at approximately 1:30 a.m., Imbrogno was approached by two men as he was sitting in his car behind his restaurant. One of the men told Imbrogno that they wanted his money and fired a shot into the car. The bullet hit Imbrogno in the face, and Imbrogno drove his car away from the restaurant and onto Roosevelt Road. Imbrogno managed to attract the attention of a West Chicago police officer, and he was taken to the emergency room of a nearby hospital. Imbrogno gave a brief description of the two men to the police, although he was unable to identify them because they were wearing ski masks.

Chester Fallin, a codefendant in the case, agreed to testify against defendant in exchange for a 10- to 15-year sentence on charges identical to those facing defendant. Fallin testified that he decided to rob Pal Joey's Restaurant because he was familiar with Joseph Imbrogno's habits. Fallin stated that he brought two ski masks, along with a gun, to the robbery scene. He further stated that after Imbrogno exited the restaurant, defendant grabbed the gun from him, approached Imbrogno's automobile, and shot Imbrogno. Fallin took the gun back and later sold it to an individual identified as Ray Lamping. Fallin left West Chicago the following day and returned approximately one month later. He was arrested on March 14, 1987.

On March 16, 1987, Fallin gave a statement to the police implicating himself, defendant, and Ray Lamping in the shooting. However, he later told the police that Lamping was not involved in the crime. Fallin admitted that he had implicated Lamping because Lamping gave the gun to the police.

Michael Hatchell testified that he was a friend of defendant and spoke to defendant on the phone two or three days after the shooting. Hatchell stated that defendant told him that Fallin shot Imbrogno during a robbery attempt and that defendant "wished he hadn't done it." In October 1987, Hatchell received another phone

call from defendant. Defendant told Hatchell that he did not commit the crime but instead that Fallin and Lamping committed the crime.

The State's final witness, Joseph Verive, agreed to testify against defendant after the State agreed to recommend a four-year sentence on an unrelated residential burglary charge and not to prosecute him for a bail bond violation. Verive testified that Fallin and defendant planned the Pal Joey's robbery while at Verive's apartment on February 3, 1987. Verive stated that Fallin and defendant left his apartment around 10 p.m., with Fallin returning about six hours later. Fallin's first words to Verive were "man, Jeff [the defendant] shot a guy." Verive also stated that he saw defendant approximately two or three weeks after the robbery. Defendant told Verive that he had to leave the State because the police recovered the gun that was used in the shooting.

Defendant did not testify and did not present any evidence at trial. Following closing arguments, the jury returned guilty verdicts on all three counts. Defendant filed two post-trial motions, one by counsel and the other *pro se*, which were both denied. This appeal followed.

Defendant first contends on appeal that the trial court erred in denying his motion to suppress the ski masks found as a result of a search at his apartment. Defendant argues that he had standing to contest the search, that the search warrant was invalid, and that the consent given on the "search waiver" form was involuntary. For the reasons stated below, we agree.

Prior to trial, defendant filed a motion to quash the search warrant and to suppress the evidence seized as a result of the search. The search warrant was issued for 805 Burr Oak, apartment No. 204, but was changed by the police officers to read apartment No. 207. This change was made without notifying or obtaining the consent of the issuing magistrate. The trial court granted the motion to quash the search warrant. In addition, the court conducted a hearing on the validity of a consent-to-search form signed by defendant's mother.

The State's first witness at the suppression hearing was Detective William Waterfield of the Du Page County sheriff's department. Detective Waterfield testified that he, along with eight other police officers, went to search defendant's apartment on April 15, 1987. Waterfield stated that he had been to the apartment once before, and believed that defendant, along with his mother and two brothers, resided there. The officers knocked at the door, did not receive an answer, kicked down the door and entered the apartment. The officers

began to search the apartment, and 15 minutes later, Detective Waterfield asked Barbara Ruenzel, defendant's mother, if he could search her automobile and the apartment. Mrs. Ruenzel agreed, and Waterfield executed a "search waiver" form which Ruenzel signed.

A copy of the "search waiver" form was included in the record on appeal. An examination of the form shows that the consent was given to search the "person—vehicle—residence" of Ruenzel, with the words "person" and "residence" crossed out. However, Detective Waterfield wrote in "residence" above the typed word that had been crossed out. Ruenzel did not initial any of the changes made on the form.

Officer Donald Goncher of the West Chicago police department testified that he found two ski masks in the apartment, one in a closet and the other in a bedroom dresser. Officer Goncher stated that he found the ski masks approximately 15 minutes after Detective Waterfield announced that Mrs. Ruenzel had given her consent to the search.

Barbara Ruenzel testified that she was at the apartment on the day of the search. Ruenzel stated that the police did not knock on the door, but instead "the door came crashing in" and "police officers came charging in." She was given a copy of the search warrant and was told to sit on the sofa while the officers searched the apartment. Ruenzel testified that she was asked to sign a consent form about one hour after the police arrived at the apartment. Ruenzel stated that she signed the consent form so that the police could only search her automobile. However, she also stated that there were no changes or words crossed out on the form at the time she signed it.

There was some confusion as to whether Ruenzel lived at the apartment that was searched. Ruenzel stated that she did not live at the apartment and did not personally know the woman who did live at the apartment. She further stated that she did not need an invitation to visit the apartment, but instead would just "show up." However, Ruenzel also testified that she kept all of her jewelry and some clothing at the apartment, and her inoperative automobile was parked in the parking lot outside of the apartment. Furthermore, Detective Waterfield testified that Ruenzel identified the residence as "my apartment."

At the close of the hearing, the State asserted that defendant failed to prove standing to challenge the search. The trial court agreed and denied defendant's motion to suppress.

In order to have standing to challenge a search, a defendant must demonstrate that his own fourth amendment rights have

been violated. (*People v. Santana* (1987), 161 Ill. App. 3d 833, 839.) To do so, a defendant must demonstrate that he has a reasonable expectation of privacy in the place searched or the property seized. (*People v. Johnson* (1986), 114 Ill. 2d 170, 191, *cert. denied* (1987), 480 U.S. 951, 94 L. Ed. 2d 802, 107 S. Ct. 1618; *People v. Morrison* (1988), 178 Ill. App. 3d 76, 82.) In determining whether an individual has a reasonable expectation of privacy, a court may look at property ownership, possessory interest in the area or property seized, ability to control use of the property, prior use of the property seized or area searched, and whether defendant had a subjective expectation of privacy in the property. (*United States v. Salvucci* (1980), 448 U.S. 83, 91, 65 L. Ed. 2d 619, 628, 100 S. Ct. 2547, 2553; *Johnson*, 114 Ill. 2d at 191-92; *People v. Dowery* (1988), 174 Ill. App. 3d 239, 242.) It has been held that a person possesses a reasonable expectation of privacy in the apartment where he or she resides. See *Payton v. New York* (1980), 445 U.S. 573, 589-90, 63 L. Ed. 2d 639, 653, 100 S. Ct. 1371, 1381-82; *People v. Bolden* (1987), 152 Ill. App. 3d 631, 635; *People v. Seybold* (1981), 98 Ill. App. 3d 236, 241-42; see also *People v. Vought* (1988), 174 Ill. App. 3d 563 (reasonable expectation of privacy in hotel room where defendant was a registered guest).

■ The State argues that defendant did not have standing to challenge the search because defendant did not present any evidence to show that he had a reasonable expectation of privacy at the apartment that was searched. At a suppression hearing, the defendant has the burden of proving that the search and seizure were unlawful. (*People v. Wingren* (1988), 167 Ill. App. 3d 313, 319; *People v. Gross* (1988), 166 Ill. App. 3d 413, 423, *cert. denied* (1988), ___ U.S. ___, 102 L. Ed. 2d 115, 109 S. Ct. 142.) Defendant argues that the evidence at the suppression hearing was sufficient to satisfy defendant's burden of proof regarding standing to contest the search.

At the suppression hearing, Detective Waterfield testified that defendant lived at "805 Burr Oak, apartment 207 in West Chicago." Waterfield stated that defendant was not present during the search, but he did reside at the apartment that was searched. Furthermore, Waterfield stated that he was acquainted with defendant because he had searched defendant's apartment on one occasion prior to the April 15, 1987, search.

Detective Charles Brinn also testified at the suppression hearing that he was present during the search of the apartment, and "was aware of a few people that lived in that apartment at that time; a Mrs. Barbra [*sic*] Runzel [*sic*], Jeffrey Walters [defendant]." In addition, Detective Brinn, in a sworn request for a search warrant,

stated that a search of 805 Burr Oak, apartment Number 207, Jeffrey Walters' apartment, would result in locating stolen property.

■■ The State argues that the police officer's testimony at the suppression hearing was insufficient to prove that defendant actually lived at the apartment. We disagree. The police officer's unrebutted testimony established that defendant resided at the apartment that was the subject of the search. As such, defendant did have a possessory interest in the apartment and a reasonable expectation of privacy in the premises. Consequently, we believe that defendant had standing to assert a violation of his fourth amendment rights.

■■ ■ The State next contends that even if defendant had standing to contest the search, defendant's motion to suppress would not have been granted because defendant's mother signed the "search waiver" form. A search conducted pursuant to a valid consent is an exception to the requirements of both probable cause and a valid search warrant. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 219, 36 L. Ed. 2d 854, 858, 93 S. Ct. 2041, 2043-44.) Consent to search a residence may be given by a third party who has control over the premises to be searched. (*United States v. Matlock* (1974), 415 U.S. 164, 171, 39 L. Ed. 2d 242, 249-50, 94 S. Ct. 988, 993; *People v. White* (1987), 117 Ill. 2d 194, 221, *cert. denied* (1988), 485 U.S. 1006, 99 L. Ed. 2d 698, 108 S. Ct. 1469.) The validity of such a consent depends on whether the consent was voluntarily given. (*People v. Bean* (1981), 84 Ill. 2d 64, 69, *cert. denied* (1981), 454 U.S. 821, 70 L. Ed. 2d 93, 102 S. Ct. 106.) In determining whether the consent was voluntary, it must be shown that the consent was freely given, and not the result of duress or coercion. *People v. Daugherty* (1987), 161 Ill. App. 3d 394, 398-99.

■ In the case at bar, Barbara Ruenzel admitted that she authorized a search of her automobile and freely signed a consent-to-search form to allow the police officers to do so. However, she stated that she did not authorize the police to search anything but her automobile. Detective Waterfield disagreed, testifying that Ruenzel gave the police the authority to search the apartment in addition to the automobile. A consent search is reasonable only if kept within the constraints of the actual consent. *People v. Porter* (1986), 141 Ill. App. 3d 71, 73, *cert. denied* (1986), 479 U.S. 951, 93 L. Ed. 2d 387, 107 S. Ct. 439; *People v. Sanders* (1976), 44 Ill. App. 3d 510, 516.

Under the above-stated principles, we believe that the scope of the actual search exceeded Mrs. Ruenzel's consent. While it is undisputed that Ruenzel did consent to a search of her automobile, it is disputed as to whether she consented to a search of the apartment.

After a careful examination of the testimony and the "search waiver" form, we do not believe that Ruenzel consented to a search of the apartment. We make this determination by noting that the police officers already had a search warrant, albeit an invalid search warrant, to search the apartment. Thus, if the officers believed that they had a valid search warrant, they would not need Ruenzel's consent to search the apartment.

If, however, the police officers did not believe that they possessed a valid search warrant at the inception of the search, the fact that the officers obtained consent to search the apartment would not alleviate the taint of the officers' illegal entry. In *Bumper v. North Carolina* (1968), 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788, the court stated that "[a] search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid." (391 U.S. at 549, 20 L. Ed. 2d at 802, 88 S. Ct. at 1792; see also *People v. Koniecki* (1985), 135 Ill. App. 3d 394, 403 (consent obtained "by the exploitation of the prior illegal search" not sufficiently distinguishable to remove it from the original taint).) Furthermore, in *People v. Day* (1988), 165 Ill. App. 3d 266, the court held that a consent obtained after an illegal entry "is not sufficiently attenuated from the illegality as to remove the taint." (*Day*, 165 Ill. App. 3d at 269.) In the present case, the testimony most favorable to the State is that the police officers knocked on the apartment door, did not announce their office, kicked down the door and began to actively search the apartment. After searching the apartment for approximately 15 minutes, the officers asked for and received Ruenzel's consent to search her automobile and possibly the apartment. The officers altered the search warrant to such a degree to render it invalid. (See *People v. Trantham* (1977), 55 Ill. App. 3d 720, 722 (warrant would have to be quashed as a matter of law if the police had searched the desired apartment instead of the apartment listed in the warrant).) In addition, the officers did not announce their office prior to kicking down the door. (See *People v. Trask* (1988), 167 Ill. App. 3d 694, 704; *People v. Marinez* (1987), 160 Ill. App. 3d 349, 352 (purpose of announcing their office is to notify individuals of the police presence and impending intrusion so that violence can be avoided and privacy respected).) Thus, given the absence of exigent circumstances in this case, the officers violated the policy behind the "knock and announce" rule. See *People v. Ouellette* (1979), 78 Ill. 2d 511, 516-17.

■■ After a review of all of the above-mentioned factors, this court is left with no alternative but to hold that Ruenzel's consent to

search the apartment, if given at all, was not voluntarily given. After the police entered the apartment, Detective Waterfield handed Barbara Ruenzel a search warrant, and the officers began to search the apartment. As the court in *Bumper* stated:

> "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." (*Bumper*, 391 U.S. at 550, 20 L. Ed. 2d at 803, 88 S. Ct. at 1792.)

While it is true that not every consent to search is automatically vitiated when a tainted warrant is involved (see *Comeaux v. Henderson* (5th Cir. 1972), 462 F.2d 1345, 1346), a consent is deemed invalid if the consent itself is the fruit of the illegal search warrant. (*United States v. Stine* (E.D. Pa. 1978), 458 F. Supp. 366.) In *Stine*, the court held that the consent was the fruit of the illegality in that the police officers were searching the defendant's home before obtaining the consent, leaving the defendant little time to make an independent decision or for intervening circumstances to lead him to conclude that he should consent to the search. (458 F. Supp. at 371.) In the case at bar, the officers claimed to have authority to search the apartment by possessing a search warrant. Thus, the occupants of the apartment, including Barbara Ruenzel, had no right to resist the search. Under the rationale enunciated in *Bumper*, Barbara Ruenzel's consent was involuntary. Absent a voluntary consent, the police did not have authority to search the apartment. (See *Bumper*, 391 U.S. at 550, 20 L. Ed. 2d at 802-03, 88 S. Ct. at 1792; *Daugherty*, 161 Ill. App. 3d at 400.) Consequently, it was error for the trial court to admit the fruits of the search, namely the two ski masks, into evidence at trial. As a result, this cause must be remanded to the trial court for a new trial.

 Having decided that the trial court erred in admitting the ski masks into evidence at trial, we now need to address the question of the sufficiency of the evidence adduced at trial which was used to convict defendant. At trial, the gun used in the shooting was properly admitted into evidence, and the testimony of a friend, a codefendant, and a friend of the codefendant implicated defendant in the offense at issue. Pursuant to *People v. Taylor* (1979), 76 Ill. 2d 289, 309, we believe that the evidence at trial was sufficient for the jury to conclude that defendant was guilty beyond a reasonable doubt. This does not mean that we are making a determination as to defendant's guilt or innocence which would be binding upon retrial;

rather, our consideration of the evidence adduced at trial will remove the risk of subjecting defendant to double jeopardy. (See *People v. Ferguson* (1988), 172 Ill. App. 3d 1, 12; *People v. Threzzy* (1987), 163 Ill. App. 3d 180, 185.) Since we conclude that defendant is entitled to a new trial on this issue alone, we do not believe that it is necessary to address defendant's other two contentions on appeal.

For the above stated reasons, the judgment of the circuit court of Du Page County is reversed, and this cause is remanded for a new trial.

Reversed and remanded.

UNVERZAGT, P.J., and NASH, J., concur.