NO. 4-99-0735

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from

Plaintiff-Appellee, ) Circuit Court of

v.      ) McLean County

THOMAS MARK BROWN, ) No. 99CF254

Defendant-Appellant. ) 

                      ) Honorable

) Donald D. Bernardi,

) Judge Presiding.

_______________________________________________________________

JUSTICE KNECHT delivered the opinion of the court:

Following an investigation of a domestic disturbance, defendant, Thomas Brown, was arrested on various counts and ultimately convicted of unlawful use or possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 1998)).  The trial court sentenced defendant to an extended term of six years, six months in prison. Defendant appeals his conviction and sentence.  We affirm.

I.  BACKGROUND

On March 17, 1999, a grand jury indicted defendant, Thomas Brown, of one count each of unlawful use or possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 1998)), domestic battery (720 ILCS 5/12-3.2(a)(1) (West 1998)), and endangering the life or health of a child (720 ILCS 5/12-21.6 (West 1998)).  Defendant was arraigned on April 2, 1999, where he waived reading of the indictment and pleaded not guilty. 

Prior to trial, the defense filed a motion to suppress confession; and on May 19, 1999 the trial court held a hearing.  Defendant argued the policed failed to read him the 
Miranda
 warnings (
Miranda v. Arizona
, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)) before questioning him and urged the trial court to suppress any statements defendant made concerning the alleged domestic dispute, "and especially" his statement indicating knowledge of a gun.

At the suppression hearing, Bloomington police officer Gil Winger testified he spoke with defendant's former girlfriend, Crystal Beaudette, and her roommate, Steven Archer, on March 5, 1999.  Beaudette told Winger she recently allowed defendant to stay at her apartment and he stayed for several days.  One evening shortly before March 5, she asked defendant to leave her apartment, but he refused.  An argument ensued, and defendant pushed Beaudette and tried to choke her.  Beaudette also told Winger defendant brought a gun into her apartment, pointed it at her, and placed it above the kitchen cabinets.  When Beaudette spoke to Winger on March 5, "all she wanted to do at that time was just have [defendant] removed from the residence."

Winger further testified Archer gave him a key to the apartment and Winger proceeded to the apartment with a backup officer Gregory Scott.  The officers knocked and, upon receiving no answer, entered the apartment using the key.  Defendant was asleep on the couch.  Winger woke defendant and began to question him about the dispute with Beaudette.  Defendant told Winger he had been baby-sitting Beaudette's child and when Beaudette accused him of swearing at the child, they began to argue.  Defendant acknowledged "there was some pushing and shoving back and forth."  Winger then asked defendant whether he had been in possession of a gun and defendant responded he recently found a gun in his own residence.  Defendant further stated he was afraid of guns and wanted to keep the gun away from his roommate, so he hid the gun in Beaudette's apartment.

As Winger questioned defendant, Scott, who was in the kitchen area of the apartment, announced he found a gun.  Winger then arrested defendant for domestic battery.  Winger said his intention when going to the apartment was not to arrest defendant, but "just to speak to [defendant]" and make him leave the residence.

Winger admitted he did not read the 
Miranda
 warnings to defendant at any time.  Winger said when he woke defendant and began to question him, he did not intend to arrest him.  On cross-examination, Winger denied he immediately told defendant to come to the station with him.  Upon further examination by the trial court, Winger stated he was obligated by department policy to question defendant about "his version of the domestic battery," even though Beaudette told him she only wanted defendant removed from the premises.  

Officer Scott testified he had little direct knowledge of the specific details of the alleged domestic dispute, because he was merely acting as a backup officer.  Scott's testimony was otherwise similar to Winger's, in that their "purpose in being there was to investigate the domestic disturbance," they had no intent to arrest defendant when they arrived at the apartment, and they "just wanted his side of the story."  

Defendant testified that as soon as Winger woke him, Winger told him to get up, get dressed, and "come with him."  While defendant put on his clothes, Winger questioned him about the domestic disturbance.  After defendant acknowledged having argued with Beaudette, Winger immediately arrested him.  According to defendant, Winger never even asked about a gun, and Scott did not find a gun until Winger informed defendant he was under arrest for domestic battery.  Defendant admitted he drank earlier in the evening and he was "still drunk" when Winger woke him up.  On this evidence, the trial court found no custodial interrogation took place, and denied defendant's motion to suppress confession.

At defendant's trial, Officers Winger and Scott testified, along with Archer.  Winger's and Scott's trial testimony was similar to their testimony during the suppression hearing, although Scott's testimony on the recovery of the weapon was more detailed.  At trial, Scott testified after he found the weapon, he heard defendant tell Winger "he had taken a weapon from a friend's to keep a friend from getting in trouble with it and brought it back to [Beaudette's apartment]."  Scott said he found the unloaded weapon on top of the kitchen cabinets about 10 to 15 feet away from defendant.  Scott acknowledged he had been given information concerning the location of the gun prior to entering the apartment.   

Scott Archer testified he moved to Bloomington in 1998, had known defendant for about eight months, and defendant "was [his] best friend."  Archer had been Beaudette's roommate for about two weeks before they made the statements to police on March 5, 1999.  He indicated defendant was staying at the apartment on March 5, but he did not actually live there.  Archer believed Beaudette and defendant had a dating relationship.

Archer testified he and Beaudette worked the same shift at Permabilt, and on March 4, 1999, they drove to work together at 4 p.m.  They arrived at Beaudette's apartment after they got off work around 12:30 a.m. on March 5.  Defendant was in the apartment when they arrived.  Soon after they returned to the apartment, Beaudette and defendant began to argue.  While Beaudette held her son, defendant shoved her and put his hands around her neck.  Archer said the encounter did not last long and shortly thereafter, he, Beaudette, and her son left the apartment and walked to the police station to report the incident.  

After making a statement, Archer accompanied the officers and Beaudette back to the apartment and they waited outside while the officers questioned and arrested defendant.  The day after defendant's arrest, Archer said defendant called him and asked him to inform the police the gun was already in the apartment when Beaudette moved in.  Archer testified he did not follow through with defendant's suggestion because he "did not want to perjure himself."  

Beaudette did not testify at defendant's trial.  The jury acquitted defendant of domestic battery and endangering the life or health of a child charges, but it convicted him of unlawful use of a weapon by a felon.  After the trial, the court held a September 2, 1999, hearing on defendant's posttrial motion.  The trial court denied defendant's request for a judgment 
n.o.v.
 or a new trial, and proceeded to sentencing.  The State recommended a sentence of 10 years, noting the charge was a Class 3 felony and defendant was eligible for an extended term.  The trial court sentenced defendant to 6 years, 6 months in prison, with credit for 182 days served.  The trial court also assessed $415 in court costs, of which $200 was for "Felony Public Defender Reimbursement."  The trial court later denied defendant's motion to reconsider sentence and this appeal followed.

II. ANALYSIS

Defendant presents four issues for review: (1) whether the trial court denied defendant a fair trial when it failed to suppress (a) a gun that was recovered after a warrantless search where no exigent circumstances were shown and (b) defendant's statement concerning a gun, which police obtained through coercive interrogation without providing 
Miranda
 warnings; (2) whether the State failed to prove beyond a reasonable doubt defendant committed the offense of unlawful possession of a weapon by a felon; (3) whether defendant's sentence must be vacated; and (4) whether the trial court's order requiring defendant to pay for his court-appointed counsel must be vacated.

A. Suppression Hearing

1. 
The
 
Gun

Defendant first argues the gun discovered by the police officers should have been suppressed because the officers acted on prior information concerning the location of the gun that was independent of defendant's statements and the officers did not present any exigency for proceeding without a warrant.  

As a threshold matter, we must determine whether defendant has standing to challenge the officers' search of the apartment and seizure of the weapon.  To establish standing to challenge a search, a defendant show his own fourth amendment rights have been violated.  
People v. Walters
, 187 Ill. App. 3d 661, 665-66, 543 N.E.2d 508, 511 (1989).  This requires the defendant to show he has a reasonable expectation of privacy in the place searched or the property seized.  
People v. Johnson
, 114 Ill. 2d 170, 191, 499 N.E.2d 1355, 1364 (1986).

Defendant argues as an invited guest in Beaudette's apartment, he has an expectation of privacy in the premises, and, therefore, standing to challenge the officers' search.  See 
Minnesota v. Olson
, 495 U.S. 91, 100, 109 L. Ed. 2d 85, 95, 110 S. Ct. 1684, 1690 (1990) (an overnight guest in another's home has standing to challenge the legality of his arrest in that home); 
People v. Olson
, 198 Ill. App. 3d 675, 681-82, 556 N.E.2d 273, 277 (1990) (relying on 
Minnesota v. Olson
 to find overnight guest of the occupant of a hotel room had standing to challenge search of that room).  

Defendant argues under this authority, as an invited guest, he has standing to challenge the search of Beaudette's apartment and the seizure of the weapon.  Defendant, however, overlooks one important fact.  Due to defendant's escalating violent behavior, Beaudette asked him to leave the apartment 
several
 times before she went to the police station and requested the officers remove him from the apartment.  During the suppression hearing, Officer Winger testified when Beaudette reported the March 5 incident, she told him she initially allowed defendant to stay at her apartment because they had been getting along better.  However, when they "started to have problems again," he "refused to leave, and he had stayed there for several days."  His refusal to leave implies she asked him to leave.  Further, during the trial, Archer testified immediately after the domestic incident on March 5, Beaudette "kept asking him [(defendant)] to go home, and he said he wasn't going anywhere."  

Therefore, after defendant pushed and choked Beaudette and after she more than once asked him to leave, defendant was  no longer an invited guest in her apartment.  Accordingly, we find at the time the police entered the apartment, defendant had no expectation of privacy in the premises and thus, no standing to challenge the legality of the officers' search and subsequent seizure of the gun.  

2. 
Confession

Defendant next argues his statement to Officer Winger, in which he admitted bringing a gun into Beaudette's apartment, should have been suppressed because the officers placed him in custodial interrogation and failed to render the 
Miranda
 warnings before questioning. 

A trial court's ruling on a motion to suppress is given great deference because the trial judge is in the best position to gauge the credibility of witnesses.  
People v. Melock
, 149 Ill. 2d 423, 432, 599 N.E.2d 941, 944 (1992).  On review, we will not disturb the trial court's ruling on a motion to suppress unless the ruling is manifestly erroneous.  
People v. Thompson
, 215 Ill. App. 3d 514, 519, 575 N.E.2d 256, 259 (1991).  Evidence presented at trial may be considered when reviewing the propriety of the trial court's ruling on a motion to suppress.  
People v. Caballero
, 102 Ill. 2d 23, 36, 464 N.E.2d 223, 229 (1984).  

We note defendant urges us to review this issue 
de
 
novo
, as is proper when the facts and credibility of witnesses are undisputed.  See 
People v. McNeal
, 175 Ill. 2d 335, 345, 677 N.E.2d 841, 846 (1997).  However, given defendant's admitted drunken state when the officers woke him and the conflicting testimony concerning the officers' first statements to defendant upon their arrival, we conclude the trial court was faced with a factual and credibility determination in making its ruling.  Therefore, we adhere to the manifestly erroneous standard of review.  

Miranda
 requires the police to follow certain procedural safeguards, which include informing a suspect of his rights, when they subject a suspect to custodial interrogation. 
Miranda
, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612.  In ascertaining what constitutes custodial interrogation, a court considers the totality of the circumstances, and then determines whether a reasonable person, innocent of any crime, would subjectively believe he is in custody.  
People v. Wipfler
, 68 Ill. 2d 158, 166, 368 N.E.2d 870, 873 (1977).  Since 
Wipfler
, our supreme court has identified a list of objective factors courts may consider when determining whether police questioning was custodial in nature: (1) the time and place of the questioning; (2) the number of officers present; (3) the absence of any family or friends; and (4) any indicia of formal arrest.  
Melock
, 149 Ill. 2d at 440, 599 N.E.2d at 948.  

Defendant argues the officers' actions in entering the apartment and waking him from a sound sleep in the early morning hours to question him about a domestic incident "bore the indicia of a formal arrest," were "highly coercive," and would make a reasonable person feel he was not free to leave the presence of the officers.  We disagree.

At the hearing on the motion to suppress, defendant testified he was "surprised" when the Officer Winger woke him.  Defendant said he had been drinking earlier in the evening and he was "still drunk," and he "kind of panicked" when Winger woke him.  He said the first thing Officer Winger said to him was "come on get dressed, you're coming with me."  As he put on his clothes, defendant said Winger asked him some general questions about the fight he had with Beaudette and then asked him about the gun.  Defendant said Winger placed him under arrest 
before
 he asked defendant about the gun.  Finally, defendant said Winger did not read the 
Miranda
 warnings before questioning or arresting him.

The trial court noted the discrepancy between defendant's and the officers' testimony concerning whether the first thing the officers said to defendant was to get dressed and come with them and, over the timing of the questioning about the gun in relation to the retrieval of the gun.  The trial court also noted defendant's admitted consumption of alcohol and his drunken state, and it found the officers' testimony concerning the sequence of these events to be more reliable.  

The trial court further found the officers did not enter the apartment with the intent to arrest defendant, but only to question him regarding the domestic violence incident.  The trial court carefully considered the facts surrounding the questioning and applied the correct analysis in determining whether the questioning amounted to a custodial interrogation: "Because I don't think an objective reading of the circumstance, and by that I mean putting an innocent person in Mr. Brown's position, would have left him or me or anyone else innocent of a crime in a belief that he was in custody."

We agree with the trial court.  While it is true Winger woke defendant from a sound sleep in the early hours of the morning, he and officer Scott peacefully and lawfully entered the premises at Beaudette's request.  None of the officers' actions were coercive.  The officers did not touch defendant other than to perform a quick weapons check.  Finally, Winger merely asked defendant simple, nonaccusatory questions concerning the domestic incident and whether defendant had a gun.  Any reasonable, innocent person would likely feel surprised or even feel panic if awakened from a sound sleep and questioned by a police officer.  However, we conclude a reasonable, innocent person in this situation would not, as a natural consequence, believe he is in police custody.  Accordingly, because we find no custodial interrogation and therefore no need to provide 
Miranda
 warnings prior to questioning defendant, the trial court's ruling denying defendant's motion to suppress his statements regarding the gun was not manifestly erroneous.  

B. Sufficiency of the Evidence

Defendant next contends the State failed to prove beyond a reasonable doubt defendant committed the offense of unlawful possession of a weapon by a felon.  We disagree.

When considering the sufficiency of the evidence on appeal, we view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements of the crime proved beyond a reasonable doubt.  
People v. Smith
, 185 Ill. 2d 532, 541, 708 N.E.2d 365, 369 (1999).  We will not reverse a conviction on grounds of insufficient evidence unless that evidence is so unsatisfactory as to raise a reasonable doubt of defendant's guilt.  
People v. Furby
, 138 Ill. 2d 434, 455, 563 N.E.2d 421, 430 (1990).  

To sustain a conviction for unlawful possession of a weapon by a felon, the State must prove (1) defendant has a prior felony conviction and (2) the defendant had knowing possession of the weapon.  
People v. Stack
, 244 Ill. App. 3d 393, 398, 613 N.E.2d 366, 369 (1993).  "Knowing possession" may be either actual or constructive.  
Stack
, 244 Ill. App. 3d at 398, 613 N.E.2d at 369.  In this case, the gun was found near defendant and not on his person; the State must therefore demonstrate constructive possession.  Constructive possession is established where (1) defendant had knowledge of the presence of the weapon; and (2) defendant exercised immediate and exclusive control over the area where the weapon was found.  
Stack
, 244 Ill. App. 3d at 398, 613 N.E.2d at 369.  Defendant's knowledge of the existence of a firearm within his possession my be inferred from circumstantial evidence.  
Stack
, 244 Ill. App. 3d at 399, 613 N.E.2d at 370; quoting 
People v. Seibech
, 141 Ill. App. 3d 45, 48, 489 N.E.2d 1138, 1141 (1986).  We note the existence of defendant's prior felony convictions is not at issue.

Here, we find ample evidence, although somewhat circumstantial, to establish defendant's constructive possession of the weapon.  Steven Archer testified defendant and Beaudette were in a dating relationship and defendant was staying at Beaudette's apartment, where the weapon was found, prior to and on the morning of March 5.  Archer also stated he either saw the gun as the police exited the apartment or he was told the police found a gun.  The jury also heard the following testimony from Archer concerning a telephone conversation he had with defendant after defendant's arrest:

"Q.  [W]hat did he say to you in that phone conversation and what did you say[?]

A.  He asked us to go down to the police station and tell them that the gun was in the house when we--when [Beaudette] moved in.

***

Q.  So did you, in fact, go down and tell the police?

A.  No, I did not because I wasn't going to perjure myself."

The jury next heard Officer Winger describe the statement defendant made to him during questioning: 

"[Defendant] told me that he had found a gun in his own apartment, not the one that we were in, but he had found it in his own apartment, and he said he was scared of guns and he wanted to hide it from his roommate.  So he took it to Miss Beaudette's apartment to keep it there."

Winger next described the apartment as a small, efficiency apartment and said the kitchen area and the living area where defendant was found sleeping, were all one room.  Officer Scott then testified the distance between the top of the kitchen cabinet, where the gun was found, and where defendant was sleeping was only between 10 and 15 feet.  

Defendant cites 
People v. Macias
, 299 Ill. App. 3d 480, 701 N.E.2d 212 (1998), in support of his contention that the State cannot prove constructive possession.  In 
Macias
, the First District reversed the defendant's unlawful use of weapons conviction because "there was no corroborating evidence offered to link defendant with the *** weapons other than the testimony of [the arresting officer].  No utility bills in defendant's name were discovered in the apartment, no fingerprint evidence was offered, and the record indicates that others had access to the apartment."  
Macias
, 299 Ill. App. 3d at 487-88, 701 N.E.2d at 218.

Here, defendant argues these facts from 
Macias
 are substantially similar to his case, and therefore, the exclusivity of defendant's knowledge or control in this case is significantly attenuated.  Defendant does not mention, however, in 
Macias
, unlike the present case, the defendant did not 
admit
 to police he brought the weapons in question into his friend's apartment.  Further, Archer's testimony corroborates the officers' testimony and there was no need for the State to use utility bills or other evidence to link defendant to Beaudette's apartment because abundant testimonial evidence established defendant's presence there. 

Accordingly, we find the evidence, viewed in the light most favorable to the prosecution, was sufficient to prove beyond a reasonable doubt defendant constructively possessed the firearm recovered from Beaudette's apartment.   

C. Sentence

1. 
Extended
 
Term

Defendant next argues because the trial court did not "clarify for the record" whether he was imposing an extended term and because the court "failed to articulate any factors justifying an extended term," we must vacate defendant's sentence.  We disagree.

Unlawful use of a weapon by a felon is a Class 3 felony.  The presentence investigation report shows defendant's adult record consisted of three prior Class 2 felonies between 1992 and 1997.  Section 5-3.2(b)(1) of the Unified Code of Corrections (Unified Code) provides a person convicted of a felony may be sentenced to an extended-term sentence pursuant to section 5-8-2 when the person is convicted of a felony after having been previously convicted of the same or similar Class felony or greater Class felony, when the conviction has occurred within 10 years after the previous conviction.  730 ILCS 5/5-5-3.2(b)(1), 5-8-2 (West 1998). Defendant's conviction for the current offense occurred within 10 years of all of his previous felony convictions, which we note were all greater Class felonies than his current Class 3 conviction.  Therefore, defendant's eligibility for an extended-term sentence is not in dispute.

Defendant bases his argument on section 5-8-1(b) of the Unified Code, which requires the trial court to set forth, on the record, its reasons for a particular sentence.  730 ILCS 5/5-8-1(b) (West 1998).  While the Unified Code does not require the trial court to recite every factor and set a value to each, the court must enumerate its consideration of the requisite aggravating factors supporting the imposition of an extended-term sentence.  
People v. Wilson
, 303 Ill. App. 3d 1035, 1046, 710 N.E.2d 408, 416 (1999).  

At defendant's sentencing hearing, the State made the following recommendation and presented evidence in aggravation:

"[T]he State would recommend [10] years in the Department of Corrections.  I would note from the presentence investigation that this is the fifth felony that the defendant is being sentenced for.  We also know that this is a Class [3] felony and the 
defendant
 
is eligible
 
for
 
extended
 
term
.  
That
 
would
 
be
 
from
 
[5]
 
to
 
[10]
 
years
.  We think based on his record and the seriousness of the offense ***."  (Emphasis added.)

The State then mentioned defendant had six rule violations in jail since his arrest for the current offense and again requested the maximum extended term of 10 years' imprisonment.

Before announcing defendant's sentence, the trial court stated:

"I would indicate that I've certainly considered the trial evidence, having heard the case, and costs of incarceration, which are considerable, the recommendations today and [defendant's] comments, and all the factors in aggravation and mitigation, 
and
 
I
 
think
 
of
 
note
 
certainly
 [
defendant
] 
does
 
have
 
a prior
 
criminal
 
history
, and this offense occurred while he was on mandatory supervised release, 
which
 
is
 
one
 
of
 
the
 
other
 
factors
 
that
 
would
 
be
 
indicated
 
in
 
the
 
statute
." (Emphasis added.) 

Two paragraphs later, the trial court again mentioned defendant's prior criminal record: "As I look at it, as I look at the prior history, as I look at the nature of this offense and the circumstances ***."  

We conclude the record clearly shows the trial court sentenced defendant to an extended term based on his prior felony record.  The State informed the court defendant was eligible for an extended term and stated the applicable extended-term sentencing range.  Both the State and the trial court emphasized defendant's prior record.  While the trial court did not precisely articulate "I am sentencing defendant to an extended term of 

6 1/2 years based on defendant's prior felony convictions," as defendant suggests was required, neither the Unified Code nor case law requires such a strict pronouncement of sentence.  While it would be a wise practice for every trial judge to be so precise, the Unified Code and 
Wilson
 merely require the trial court to enumerate its consideration of requisite aggravating factors that support the imposition of an extended-term sentence.  Here, the trial court enumerated its consideration of defendant's prior felony record as an aggravating factor.  This aggravating factor supported the imposition of the extended-term sentence, for which defendant was clearly eligible.  Therefore, the trial court committed no sentencing error.

2. 
Indictment

Defendant next contends the indictment charging him with unlawful use of a weapon by a felon was constitutionally
 deficient under 
Apprendi
 because it failed to inform defendant of the possible sentencing range for the offense and of his eligibility for an extended-term sentence.  Defendant, therefore, requests that we vacate his sentence.  We disagree. 

In relevant part, the Supreme Court in 
Apprendi
 held "[
o]ther
 
than
 
the
 
fact
 
of
 
a
 
prior
 
conviction
, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be [charged in an indictment,] submitted to a jury, and proved beyond a reasonable doubt."  
Apprendi v. New Jersey
, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 455, 120 S. Ct. 2348, 2362-63 (2000) (emphasis added).  This court recently held 
Apprendi
 does not render unconstitutional the statute authorizing sentencing enhancements based on prior convictions.  
People v. Dillard
, 319 Ill. App. 3d 102, 109, 745 N.E.2d 185, 191 (2001); see 730 ILCS 5/5-5-3.2(b)(1) (West 1998).

Based on the Supreme Court's own qualification on its holding in 
Apprendi
 (the fact of a prior conviction need not be charged in the indictment), and our subsequent holding in 
Dillard
, defendant's attack on his extended-term sentence based on the rationale of 
Apprendi
 fails.  

D. Public Defender Fee

Defendant finally contends the trial court's order requiring him to pay for his court-appointed counsel must be vacated.  

Prior to trial, the trial court assessed a $200 public defender fee against defendant.  A hearing on defendant's ability to pay for his court-appointed attorney was never held.  At sentencing, the trial court ordered defendant to pay $415 in court costs.  Attached to the sentencing order was a "notice to defendant," which informed defendant he was to repay the court costs in full by September 2, 2003.  An itemization of the $415 in court costs shows it includes the $200 assessment for "Felony Public Defendant Reimbursement."  

The public defender filed a waiver of the remaining balance of the fees on September 24, 1999.  However, there is no indication defendant's sentencing order requiring him to pay $415 in court costs has been amended to reflect the $200 credit after the public defender filed its waiver of fees.  The State agrees defendant's sentencing order does not reflect the $200 credit.

For clarity and to ensure defendant is not held responsible for the $200 public defender fee as indicated in his sentencing order, we remand the cause so the trial court may issue a corrected written judgment of sentence to reflect the $200 credit pursuant to the public defender's waiver of fees. 

III. CONCLUSION

We affirm defendant's conviction and sentence but remand for correction of defendant's sentencing order to reflect a credit for public defender fees. 

Affirmed and remanded with directions. 

COOK and STEIGMANN, JJ., concur.