2020 IL App (1st) 190131-U

No. 1-19-0131

Order filed November 12, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 16857 |
| | ) | |
| DEVON FREEMAN, | ) | Honorable |
| | ) | Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BURKE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Defendant's conviction for unlawful use or possession of a weapon by a felon is affirmed where there was sufficient circumstantial evidence to establish he constructively possessed the firearm found near him at the time of his arrest.

¶ 2     Following a jury trial, defendant Devon Freeman was found guilty of unlawful use or possession of a weapon by a felon (UUWF) and sentenced to six years' imprisonment. On appeal, defendant argues we should reverse his conviction where no evidence connected him to the firearm found near where police found him hiding. For the following reasons, we affirm.

¶ 3    Defendant was charged by indictment with multiple counts of UUWF and aggravated unlawful use of a weapon. The State proceeded to trial on one count of UUWF (720 ILCS 5/24-1.1(a) (West 2016)), and nol-prossed the remaining counts. Relevant here, the indictment alleged that on or about October 23, 2016, defendant knowingly possessed a firearm after having been previously convicted of the felony offense of aggravated battery with a firearm under case number 07 CR 2403002.

¶ 4    At trial, Chicago police officer John Craig testified that around 10 a.m. on October 23, 2016, he observed a Nissan Murano drive by without a front license plate. Craig followed the Murano and "ran" its back license plate number, which came back "stolen/missing." Craig activated his emergency equipment and curbed the Murano.

¶ 5    Craig approached the Murano and observed three men inside. In court, Craig identified defendant as the man in the front passenger seat. Craig asked the driver to roll down the windows and for everyone to put their hands in the air. Craig then asked the driver for his license. Craig learned the driver's license was suspended, so asked the driver for the vehicle's keys. The driver complied. While Craig spoke to the driver, the rear passenger tried to open the rear passenger side door. Craig then called for another squad vehicle. While Craig waited for backup, he asked the occupants to stay in the Murano with their hands up.

¶ 6    Two to three minutes later, other units arrived and parked in front of the Murano and behind Craig's vehicle. Craig stayed by the driver while two officers stood at the rear passenger and front passenger doors. Craig asked the driver about weapons. Because he "didn't like the questions that were coming back," Craig had the occupants exit the vehicle. As the officers removed defendant from the vehicle, he pushed past an officer and ran. The rear occupant also

ran from the vehicle in the opposite direction, and Craig chased him. Craig's squad vehicle camera recorded the traffic stop, which Craig testified provided a true and accurate reflection of the events. The video was published to the jury. Craig stated it showed him following the Murano, pulling it over, and speaking to its occupants. It showed additional officers surround the vehicle, the occupants exit, and defendant running away. On cross-examination, Craig testified that he did not see any firearms in the Murano during the traffic stop, defendant holding a firearm, a bulge in defendant's pants, or defendant holding his waistband.

¶ 7     Chicago police officer Michael Donahue testified that he responded to Craig's call for assistance. In court, Donahue identified defendant as the front passenger of the stopped vehicle. Donahue placed himself by defendant's door and observed the rear passenger repeatedly drop his hand despite multiple requests to keep his hands visible. Craig then asked the occupants to exit the vehicle and Donahue asked defendant to exit. When defendant began exiting, Donahue turned defendant to face the vehicle so he could conduct a protective pat down because he believed there was a weapon in the vehicle or on defendant's person. As Donahue did so, he "glanced" at the rear passenger who had lowered his hand again, and defendant ran before Donahue was able to start a pat down. Donahue pursued defendant, who held the "waist area" of his pants as he ran. Donahue had made more than 30 arrests involving firearms. He testified suspects commonly hold firearms on their persons in their front pocket or their waist area.

¶ 8     When the chase began, Donahue tripped and lost sight of defendant in an alley. As Donahue entered the alley, he heard a "brush area" next to a chain link fence "moving" and the fence rattle. Donahue then heard several gunshots in another area, and left to investigate them. Approximately 10 minutes later, Donahue returned to the alley with other officers. He observed

defendant lying on the ground in a large bush next to a chain link fence. Donahue called to other officers who then detained defendant. Donahue later learned that a firearm was recovered from the bush.

¶ 9    Donahue testified he reviewed video from other officers' squad vehicles that truly and accurately depicted the events. The video was published to the jury, and shows the Murano's passengers exiting and running in opposite directions. The State also published photographs, which Donahue stated showed the area where defendant was found. The photographs depict an area with large shrubbery and a nearby chain link fence.

¶ 10    On cross-examination, Donahue testified that he never saw defendant with a firearm or make furtive movements while in the vehicle. He did not see a weapon, bulge, or other object on defendant's waist. Donahue briefly touched defendant's sides on his lower back under his arms to position him for a pat down.

¶ 11    Chicago police detective Brian Burg testified he responded to the scene and Donahue had located an individual who fled on foot. Burg described the location Donahue indicated as an "overgrown bushy area" 6 feet high and 20 feet square. When Burg first arrived to the area, he had to physically move the brush out of the way to get into the bush. He then saw a man, who he identified as defendant in court, lying face down in the bush with a firearm 12 to 18 inches from his head. Burg did not have to dig to find the firearm. The State published photographs for the jury, which Burg stated truly and accurately depicted the area where defendant was found. The photographs show a large bush with a trampled area in the center. They also show a firearm on the ground among twigs and greenery, near a can, tire rim, and other debris. Burg identified the firearm in court.

¶ 12    On cross-examination, Burg testified that he saw defendant at the same time he saw the firearm, and immediately wanted to secure defendant's arms so defendant could not reach for the firearm. He never saw defendant holding the firearm. Although Burg did not initially notice, he later became aware that there was debris and garbage, including a tire rim and empty cans, in the area where defendant was found. Defense counsel showed Burg a photograph, which Burg stated depicted the firearm's "handle" closest to a blue can. Defense counsel showed Burg a different photograph, which Burg stated depicted the firearm's "muzzle" closest to the can.[1]

¶ 13    Raphael Garcia, an evidence technician for the Chicago Police Department, testified that he photographed the scene where defendant was found. Garcia photographed and then recovered a loaded 9-millimeter semiautomatic firearm from under a bush. The firearm was sent to the crime lab for testing. The State published photographs, which Garcia stated depicted the recovered firearm. Garcia also identified the actual firearm.

¶ 14    On cross-examination, Garcia testified that one photograph of the firearm showed its "brick" closest to a blue can, while another photograph showed the firearm's "barrel" closest to the can. Garcia explained that one photograph was how the firearm was originally found, while the officers moved the firearm for the other photograph to get a "better view" of it. He further explained that the firearm was found in a "standing position" with sticks and branches on it. Garcia viewed another photograph of the firearm, which he stated depicted a tire rim around 24 inches away.

---

[1] At trial, defense counsel entered this photograph as Defense Exhibit 1. However, Defense Exhibit 1 is not included in the impounding order and no exhibit labeled Defense Exhibit 1 is included in the record on appeal.

¶ 15     The State entered a stipulation that defendant was previously convicted of a qualifying felony offense. The State also entered stipulations that, if called, Ronald Tomek, an expert in forensic biology, would testify he analyzed two sets of swabs used to collect cellular material from the recovered firearm. Wendy Gruhl, an expert in forensic DNA analysis, would testify her analysis of the swabs revealed a mixture of at least four people's DNA, which was not suitable for testing. The DNA from the cartridges and magazine had a mixture of at least two people, which was also not suitable for testing. Joseph Wohrstein, an expert in latent print identification, would testify that no fingerprints were found on the firearm, live cartridges, or magazine, but that people can touch objects without leaving a fingerprint. The State also entered a stipulation that during defendant's custodial search, an officer recovered one hand rolled cigar and one small zip lock bag containing cannabis. The State entered into evidence the recovered firearm and a map depicting where the traffic stop occurred and defendant was found.

¶ 16     The jury found defendant guilty of UUWF. Defendant filed a motion for a new trial, which the trial court denied. Following a sentencing hearing, the trial court sentenced defendant to six years' imprisonment. Defendant filed a motion to reconsider his sentence, which the trial court denied.

¶ 17     On appeal, defendant argues we should reverse his conviction because there was no evidence connecting him to the firearm found near where he was hiding and the State failed to prove he had any knowledge that the firearm was present in the bush.

¶ 18     In reviewing the sufficiency of the evidence, we ask whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the elements of the crime beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). Under this

standard, we will not retry the defendant, and must draw all reasonable inferences from the evidence in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. While not conclusive, the trier of fact's determinations regarding witness credibility, the weight of the evidence, and the resolution of conflicts in the evidence are entitled to great deference. *Ross*, 229 Ill. 2d at 272.

¶ 19    To convict defendant of UUWF, the State had to prove that he was previously convicted of a qualifying felony and knowingly possessed on or about his person a firearm. See 720 ILCS 5/24-1.1(a) (West 2016). Defendant does not challenge the evidence demonstrating his prior qualifying conviction. He solely argues the State failed to prove he knowingly possessed the firearm.

¶ 20    The element of possession may be established by either actual or constructive possession. *People v. Tates*, 2016 IL App (1st) 140619, ¶ 19. Here, the officers found the firearm near defendant but not on his person. Therefore, the State was required to demonstrate that he constructively possessed it. See *People v. Brown*, 327 Ill. App. 3d 816, 824 (2002). To do so, the State had to show defendant (1) knew the firearm was present, and (2) "exercised immediate and exclusive control over the area" where it was found. *People v. Ross*, 407 Ill. App. 3d 931, 935 (2011).

¶ 21    A defendant's knowledge can be inferred from various factors, such as the visibility of the weapon, the amount of time that a defendant had to observe it, the weapon's size, and whether a defendant made gestures or movements suggesting he attempted to retrieve or conceal it. *People v. Nesbit*, 398 Ill. App. 3d 200, 209 (2010). Control is established by showing that a defendant had "the intent and capability to maintain control and dominion over an item." (Internal quotation marks omitted.) *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17. A

defendant's control over the area where a weapon is found gives rise to the inference that he possessed it. *People v. McCarter*, 339 Ill. App. 3d 876, 879 (2003).

¶ 22    "Constructive possession is often proven entirely by circumstantial evidence." *People v. Maldonado*, 2015 IL App (1st) 131874, ¶ 23. Further, "[k]nowledge and possession are questions of fact to be resolved by the trier of fact, whose findings should not be disturbed upon review unless the evidence is so unbelievable, improbable, or palpably contrary to the verdict that it creates a reasonable doubt of guilt." (Internal quotation marks omitted.) *People v. Faulkner*, 2017 IL App (1st) 132884, ¶ 39.

¶ 23    Viewing the evidence in the light most favorable to the State, we find a rational trier of fact could have found that defendant had constructive possession of the firearm. The evidence showed that defendant was in a vehicle that was pulled over for a traffic stop. When Officer Donahue asked defendant to exit the vehicle and prepared to perform a protective pat down, defendant pushed past him and fled, from which a trier of fact can infer a defendant's guilt. See *People v. Moore*, 2015 IL App (1st) 140051, ¶ 26 ("[e]vidence of flight is admissible as tending to demonstrate a defendant's consciousness of guilt").

¶ 24    Further, Donahue testified defendant held his waist area as he ran and, in Donahue's experience as a police officer, suspects commonly held their firearms in the waist area. With Donahue chasing after him, defendant ran into an overgrown area, where he was found some 10 minutes later hiding face down in a bush with a firearm 12 to 18 inches from his head. From this evidence, the jury could reasonably believe that defendant, a convicted felon, had the firearm in his waistband when he stepped from the vehicle, fled from police before the pat down to avoid detection of the firearm, and took the firearm from his waistband when he hid with the firearm in

a bush, demonstrating his knowing possession of the firearm. See *People v. Anderson*, 2018 IL App (4th) 160037, ¶¶ 33-34 (finding the evidence was sufficient to demonstrate that the defendant had constructive possession over a firearm found lying two to three feet from him in a yard where no one else was present after he fled officers with his hands tucked inside his waistband, even though he was not seen holding a firearm).

¶ 25    Citing *People v. Sams*, 2013 IL App (1st) 121431, defendant argues the State failed to prove he possessed the firearm in the bush. In *Sams*, we found the State failed to prove the defendant constructively possessed a weapon police officers found underneath a couch in a residence he was seen exiting, but where he did not live. *Sams*, 2013 IL App (1st) 121431, ¶¶ 13-14, 19. We noted the officers' testimony showed "only that [the] defendant walked out of a house in which a gun was later found" and that "[m]ere presence in the vicinity or access to the area in which contraband is found is insufficient to establish constructive possession." *Id.* ¶ 13. Defendant argues that, as in *Sams*, no officer saw defendant with a firearm, saw defendant make furtive movements, or saw anything else, such as a suspicious "bulge," to suggest defendant was carrying a firearm. He argues his proximity to the firearm does not establish he knew it was there.

¶ 26    We find *Sams* distinguishable. Unlike in *Sams*, defendant here fled from a police officer about to conduct a protective pat down of him; as he ran, he was holding the front waist area of his pants where "suspects" commonly hold their firearms; and police then found him lying in a bush with a firearm 12 to 18 inches away from him and secured his arms so that he could not reach the weapon. Unlike in *Sams*, the evidence reasonably demonstrates defendant constructively possessed the firearm found inches from where he was found.

¶ 27    Defendant argues his fleeing police does not demonstrate he ran because he was carrying a firearm as he had an independent reason for running from police: he was carrying an unlawful controlled substance in his waistband.[2] See *People v. Donahue*, 2014 IL App (1st) 120163, ¶ 91 (finding that, where the defendant had two other pending criminal cases, "his flight did not necessarily reflect consciousness of guilt of this particular crime"). Defendant asserts his holding his waist area as he ran could have been because he was attempting to hold onto the drugs, particularly where no officers saw a firearm or "bulge" on defendant.

¶ 28    However, the jury heard the evidence that defendant ran from the traffic stop holding his waist area and was found with drugs on his person and a firearm nearby. Given Donahue's testimony that defendant was holding his waist area and that suspects often hold firearms there, we cannot say that the jury's conclusion that defendant possessed the firearm was unreasonable simply because it could have concluded otherwise based on the evidence presented. See *In re Jonathon C.*, 2011 IL 107750, ¶ 60 ("A trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor must the trier of fact search out all possible explanations consistent with innocence, and raise those explanations to a level of reasonable doubt.").

¶ 29    Similarly, we reject defendant's argument that the evidence that there were discarded items in the bush near the firearm, the firearm was found under sticks and underbrush, Donahue did not see the firearm when he found defendant in the bush, and no forensic evidence linked defendant to the firearm does not support an inference defendant knew the firearm was in the

---

[2] At multiple points in his briefs, defendant asserts the drugs were recovered from his waistband, citing to the stipulation read into the record at "Supp.R.576." However, the stipulation only states that, pursuant to a custodial search, a hand rolled cigar and a small zip lock bag of cannabis were recovered from defendant. It does not specify where the drugs were found on defendant's person.

bush. The jury heard these same arguments and the underlying evidence and concluded the evidence was sufficient to demonstrate defendant's knowing possession of the firearm. Viewing the evidence in the light most favorable to the State, we cannot find the evidence so unbelievable, improbable, or unsatisfactory that no rational trier of fact could have found defendant guilty of UUWF.

¶ 30    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 31    Affirmed.