2019 IL App (1st) 171375-U

No. 1-17-1375

Order filed December 31, 2019

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 6552 |
| | ) | |
| KEVIN CLAY, | ) | Honorable |
| | ) | Neera Lall Walsh, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: Pursuant to one-act, one-crime rule, defendant's sentence for unlawful use or possession of firearm by felon is vacated, as it is based on same conduct as his conviction for armed habitual criminal. We affirm trial court's judgment in all other respects over defendant's contentions that evidence was insufficient to prove him guilty beyond reasonable doubt and that trial court erred in admitting his prior convictions into evidence.

¶ 2    Following a bench trial, defendant Kevin Clay was found guilty of armed habitual

criminal (720 ILCS 5/24-1.7(a) (West 2014)) and the unauthorized use or possession of a firearm

by a felon (UUWF) (720 5/24-1.1(a) (West 2014)). He was sentenced to eight years in prison for armed habitual criminal and to a concurrent eight-year sentence for UUWF. On appeal, defendant claims he was not proven guilty beyond a reasonable doubt, as the State failed to establish his constructive possession of the firearm at issue. He also says the trial court failed to conduct a meaningful balancing test pursuant to *People v. Montgomery*, 47 Ill. 2d 510 (1971), regarding the admission of his prior convictions. He finally contends that his conviction for UUWF should be vacated pursuant to the one-act, one-crime rule. We agree only with that last point. We thus affirm in part and vacate in part.

¶ 3     Defendant was charged with armed habitual criminal, UUWF, and aggravated unlawful use of a weapon following his April 9, 2015 arrest. The State proceeded to trial on the charges of armed habitual criminal and UUWF.

¶ 4     At trial, Chicago police officer Martino testified that he and his partner, Officer Scudella, were on patrol on April 9, 2015. (Neither officer's first name appears in the record.) They saw a green Ford Taurus go through a red light "without stopping." Martino, who was driving a squad car, made a u-turn to follow the Taurus and activated the car's lights. The Taurus then stopped, and the squad car pulled in behind it. Two people "hastily exited" and walked in opposite directions. The driver dropped car keys from his hand to the ground. Martino identified defendant in court as the driver. The officers ordered both people back to the car and Martino "eventually" picked up the keys. Martino asked whether defendant had his driver's license and what "his license status was." After defendant replied that he did not have a driver's license, Martino placed him in handcuffs.

¶ 5    At one point, as the group was standing at the front bumper of the squad car, behind the Taurus, Martino and Scudella "said to each other [that] we both detected a strong odor of cannabis." When Martino asked defendant about the smell, defendant replied that he had "just smoked a blunt."  Martino stayed with defendant and the passenger while Scudella searched the Taurus. By this point, Scudella had the keys to the Taurus and opened the trunk. As soon as the trunk opened, defendant fled. Martino pursued defendant until defendant fell. Martino then picked him up and walked him to a squad car. Martino returned to the Taurus and watched as Scudella recovered a black knit winter hat containing a handgun from the trunk.

¶ 6    Later, at the police station, Martino had a conversation with defendant. Scudella was also present. After Martino read defendant *Miranda* warnings, defendant stated that he was driving the Taurus to check its brakes, as he was considering buying it; he did not have a driver's license; and he had been shot before. Defendant then told Martino that "everywhere he goes he gets into it," and that "You saw I ran when the trunk opened, so obviously the gun is mine." Defendant then repeated "It's mine."

¶ 7    During cross-examination, Martino testified that he did not see defendant or the passenger put anything in the backseat or trunk. Martino believed that the firearm was sent to the Illinois State Crime Lab, but did not know whether any fingerprints or latent impressions were taken from it. During his investigation, Martino learned that the Taurus did not belong to defendant or the passenger. Defendant's statement was not memorialized in writing.

¶ 8    Officer Scudella testified consistently with Martino that when the Taurus stopped, the driver left the vehicle and began to walk away. He identified defendant in court as the driver. Scudella's search of the car revealed that the "pass-through" to the trunk, in the backseat area,

was open, so he decided to inspect the trunk. He got the keys from Martino and opened the trunk. As soon as the trunk was "pop[ped]," defendant started running. Scudella stayed with the passenger while Martino chased defendant. When Martino returned, Scudella inspected the trunk and retrieved a knit winter hat, which contained a loaded blue steel Smith & Wesson semiautomatic handgun. Later, at the police station, Scudella sat outside a door while Martino and defendant spoke. During cross-examination, Scudella testified that he heard defendant state "obviously the gun is mine."

¶ 9    The State then entered into evidence certified records of conviction for defendant in case number 08 CR 13536 for aggravated battery to a police officer, and in case number 08 CR 7925 for the manufacture or delivery of a controlled substance.

¶ 10    Defendant testified that, after test-driving his neighbor's Taurus with his friend Derrell Lewis, they were "grabbed" by the police and asked if they were "driving the Taurus." Defendant replied, "Yeah."  Defendant had driven past a police car, but the officers "pulled up" when defendant and Lewis were at a friend's house "fitting to buy a car and took us back to the block we just came from." In other words, defendant and Lewis had already left the Taurus and walked away when the police arrived. During a subsequent conversation with the officers, defendant was asked whether he and Lewis were smoking "weed." Defendant answered no, as he smoked cigarettes. When the officers asked for a driver's license, defendant could not provide one, as he did not have it with him. The police then searched the Taurus. Defendant admitted that he ran away from the police at one point but explained that it was because his driver's license was suspended.

¶ 11     When defendant spoke to officers at a police station, he was told that he was going to be charged because there was a gun in the trunk. He denied having any knowledge of the firearm, as he was "just test driving the car." Defendant never saw the firearm and told officers that he knew "nothing" about it. He used the word "obviously" when speaking to the officers because there was nothing he "can do about it" if the officers said the firearm belonged to him. The court asked defendant to explain. Defendant testified that he said it was "obviously" his firearm because he "couldn't do nothing about it." That is, the officer had "the upper hand to who he [was] going to put it on," either defendant or the passenger. Defendant was "just being sarcastic." Defendant had been arrested "three [or] four times for some heroin," and had prior felony convictions. He knew that he would probably go to jail if he was stopped while driving on a suspended license.

¶ 12     During cross-examination, defendant testified that he did not want to "get locked up" for driving on a suspended license, so he threw away the car keys. He denied being stopped by the police when he was in the car; rather, he was walking in the middle of the block.

¶ 13     The State then "show[ed] Defense Counsel" and entered into evidence, for the purpose of impeachment, self-authenticating documents from the circuit court of Cook County showing defendant's convictions for possession of a controlled substance in case number 11 CR 4525, convictions for aggravated battery to a police officer and a drug offense under case number 08 CR 13536, and drug convictions under case numbers 08 CR 7952 and 08 CR 6281, respectively.

¶ 14     In finding defendant guilty of armed habitual criminal and UUWF, the trial court stated that Martino observed defendant drop keys, and that those keys linked defendant to the car. The court found defendant's "story that he was walking away and not near that car and that the officers are just putting this car and the gun on him *** hard to believe." The court next stated

that, although defendant testified that he ran because he was driving with a suspended license, that explanation did not make sense, noting that defendant did not run until the trunk was opened. The court further noted that the passenger did not flee; rather, it was defendant, "whose credibility is called into question, because he does have these cases in his background that he has convictions for," who ran. The court finally noted that it did not believe defendant's statement that the firearm was "obviously" his to be a "sarcastic comment," and it did not find defendant credible. Defendant filed a motion for a new trial, which the court denied. The trial court then sentenced defendant to two concurrent eight-year prison terms.

¶ 15    On appeal, defendant first claims he was not proven guilty beyond a reasonable doubt of either armed habitual criminal or UUWF as the State failed to establish that he possessed the firearm recovered from the Taurus.

¶ 16    When considering the sufficiency of the evidence, we ask whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. All reasonable inferences from the record must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. It is the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh evidence, and to draw reasonable inferences from the facts. *Brown*, 2013 IL 114196, ¶ 48. A reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses. *Id*. A defendant's conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of his guilt. *Id.*

¶ 17    To prove defendant guilty of armed habitual criminal, the State was required to prove beyond a reasonable doubt that defendant possessed a gun after having been twice-convicted of certain qualifying felonies. See 720 ILCS 5/24-1.7(a) (West 2014). Similarly, to prove defendant guilty of UUWF, the State had to show defendant knowingly possessed a firearm after being convicted of a felony. See 720 ILCS 5/24-1.1(a) (West 2014). Defendant disputes only the element of possession.

¶ 18    Possession may be either actual or constructive. *People v. Terrell*, 2017 IL App (1st) 142726, ¶ 18. Here, it is undisputed that defendant did not actually possess the firearm recovered from the Taurus. That leaves constructive possession, which requires proof that defendant had knowledge of the presence of the weapon and that he exercised "immediate and exclusive" control over the area where it was found. *People v. Tates*, 2016 IL App (1st) 140619, ¶ 19. Evidence of control and knowledge is often purely circumstantial. See *People v. McLaurin*, 331 Ill. App. 3d 498, 502 (2002).

¶ 19    Defendant says the State did not prove that he owned or had "ongoing control" of the Taurus in which the gun was recovered, nor did the State prove that he had any knowledge of the weapon stored within the Taurus. At the outset, however, defendant must contend with the testimony from the officers that defendant admitted to owning the firearm. Defendant testified that he was being sarcastic, but the trial court believed the officers, and we have been provided no reason to second-guess that credibility determination. See *Brown*, 2013 IL 114196, ¶ 48. As defendant's admission directly proved his possession of the weapon, the State arguably was not required to prove anything further. See, *e.g.*, *People v. Brown*, 327 Ill. App. 3d 816, 826 (2002) (because defendant admitted to testifying officer that gun in friend's apartment was his, there

was "no need for the State to use utility bills or other evidence to link defendant to [the friend's] apartment").

¶ 20    In any event, the State's proof went beyond that admission. Evidence of defendant's control of the Taurus consisted of the two officers' testimony that defendant was driving the Taurus, along with one officer's testimony that defendant dropped the car keys to the ground after leaving the vehicle. Clearly, the driver of a vehicle controls that vehicle. And such control gives rise to an inference that defendant possessed the contraband within that vehicle. See *People v. McCarter*, 339 Ill. App. 3d 876, 879 (2003) (control over location where weapon is found gives rise to inference that defendant possessed weapon).

¶ 21    Defendant's knowledge that a gun was located within the Taurus may be established circumstantially by his "acts, declarations, or conduct." *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17. Here, we have not only the fact of defendant's flight from the police but the timing of that flight. Defendant remained by the car after having admitted to the officers that he lacked a valid driver's license. It was not until Scudella opened the trunk that defendant fled from the officers. So while defendant claims he ran because he knew he didn't have a valid license, the evidence suggests that he ran only when he realized the officers were about to discover the weapon hidden in the trunk.

¶ 22    That evidence, along with defendant's admission to owning the gun, was more than sufficient to prove constructive possession of the weapon. The trial court could have reasonably found that defendant possessed the firearm to support convictions for armed habitual criminal and UUWF.

¶ 23    Defendant next contends that the trial court erred when it failed to conduct a meaningful balancing test pursuant to *People v. Montgomery*, 47 Ill. 2d 510 (1971), before admitting his prior felony convictions for impeachment purposes. He claims there is no indication in the record that the trial court utilized the *Montgomery* balancing test to determine whether defendant would suffer unfair prejudice if his prior convictions were admitted. This was particularly prejudicial, he says, because the outcome of this case rested on whose version of events the trial court believed. Defendant couches this argument as a claim of trial error or, in the alternative, ineffective assistance of counsel for failing to object and preserve the issue in a post-trial motion.

¶ 24    Evidence of a defendant's prior conviction is admissible to impeach his credibility when: (1) the prior conviction was punishable by death or imprisonment in excess of one year, or involved dishonesty or false statements regardless of the punishment; (2) less than 10 years have passed since the conviction date or the defendant's release from confinement, whichever date is later; and (3) the prior conviction's probative value outweighs the danger of unfair prejudice. *Montgomery*, 47 Ill. 2d at 516. Here, defendant contests only the third element.

¶ 25    Defendant argues, and our review of the record confirms, that neither the State nor the defense made a motion pursuant to *Montgomery* seeking either to introduce or bar the admission of defendant's prior convictions for impeachment purposes. The record does not contain any discussion before the trial court regarding defendant's prior convictions or whether they satisfied the requirements of *Montgomery*—that is, the length of those sentences, the date of the convictions or of defendant's release, or the balancing of probative value versus prejudice.

¶ 26    But even if error occurred, we do not find plain error under either prong of that doctrine. We will grant relief for an unpreserved error only if "(1) the evidence is close, regardless of the

seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005).

¶ 27    We do not find the evidence closely balanced. Defendant characterizes this case as a credibility contest between the police officers on the one hand, and defendant on the other. That is not entirely consistent with how we see it. But either way, it does not necessarily follow that this "contest" was a close one. It was not.

¶ 28    We must undertake "a commonsense analysis of all the evidence in context" when considering a first-prong plain-error argument. *People v. Belknap*, 2014 IL 117094, ¶ 50. The police officers' testimony was straightforward. They pulled over the Taurus for a traffic violation. Defendant threw the car keys down on the street when he left the Taurus. Defendant initially complied with the traffic stop and fled the scene only when one of the officers opened the trunk, where the gun was ultimately found. And after being taken into custody, defendant admitted that the gun was "obviously" his.

¶ 29    Defendant's testimony did not sharply vary from the officers' testimony. He did not deny driving the Taurus, nor did he deny that the police pulled up behind the Taurus. He did not deny throwing down the car keys in the street. His testimony differed from that of the police officers only insofar as he claimed to have already parked and walked away from the Taurus when the police car pulled up. (Even *that* testimony was not entirely different; the officers said that defendant had left the car by the time they pulled up; defendant testified that he proceeded farther beyond the vehicle, toward the next block, by the time the police arrived.)

¶ 30    Defendant did not deny that he ran from the police, just as the officers testified, but he explained his reason for fleeing as not wanting to be arrested for driving on a suspended license.

But the timing of when he fled was uncontradicted. He didn't run right away, or even after being initially detained and having told the officers that his license was suspended; instead, he ran only when the officer began to search the trunk. And it was more than reasonable to infer from that *uncontradicted* evidence that the reason defendant fled at that time was his fear that the gun would be discovered.

¶ 31     So the evidence of defendant's control of the vehicle was not disputed by defendant. And his knowledge of the presence of a weapon, based largely on the timing of when he ran, was not, either. While defendant had an answer for why he ran, the timing of his flight undermined that stated reason. On those two points, no real "credibility" contest occurred.

¶ 32     Nor did defendant even dispute the officers' testimony that he admitted to owning the gun, telling the officers that the gun was "obviously" his. His argument, instead, was that he was kidding—he was being sarcastic. The trial court could have reasonably rejected that testimony as implausible.

¶ 33     The officers' testimony, in other words, was uncontradicted. Defendant's claim of why he ran, and his claim of sarcasm to explain his admission to the officers, were both implausible. We do not find the evidence to have been closely balanced. Plain-error review under the first prong is thus not available.

¶ 34     Nor is plain-error review under the second prong. This error is not one we would consider so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. See *Herron*, 215 Ill. 2d at 187. Any error here by the trial court in admitting the prior convictions without conducting the necessary *Montgomery* analysis would simply be an error

that occurred within the trial proceedings and would not challenge the integrity of the judicial process. Thus, defendant cannot establish plain error under the second prong.

¶ 35     For many of the same reasons, we likewise reject defendant's ineffective-assistance claim. To establish ineffective assistance of counsel, a defendant must demonstrate that his counsel's performance was fundamentally deficient and that, but for counsel's deficient performance, the result of the proceeding would have been different. *People v. Coleman*, 183 Ill. 2d 366, 397-98 (1998); *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984)).

¶ 36     Here, defendant cannot establish prejudice. As discussed above, the evidence was not closely balanced. See *People v. White*, 2011 IL 109689, ¶ 133 (noting that plain-error review pursuant to closely-balanced-evidence prong "is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced: that the evidence is so closely balanced that the alleged error alone would tip the scales of justice against him"). Thus, defendant cannot establish that, had counsel objected, the result of the proceeding in the trial court would have been different.

¶ 37     Defendant finally contends, and the State concedes, that his conviction for UUWF must be vacated pursuant to the one-act, one-crime doctrine, because it arose from the same physical act as his conviction for armed habitual criminal. Defendant did not raise his one-act, one-crime challenge in the trial court and, therefore, forfeiture applies. *People v. Harvey*, 211 Ill. 2d 368, 388-89 (2004). However, one-act, one-crime violations are subject to review under the second prong of the plain error doctrine. *Id.* at 389.

¶ 38     Pursuant to the one-act, one-crime doctrine, "a defendant may not be convicted of multiple offenses that are based upon precisely the same physical act." *People v. Johnson*, 237

Ill. 2d 81, 97 (2010). When a challenge is raised under the one-act, one-crime doctrine, the court first determines whether the defendant's conduct consisted of a single physical act or separate acts. *People v. Coats*, 2018 IL 121926, ¶ 12. If only one physical act was undertaken, then multiple convictions are improper. *People v. Artis*, 232 Ill. 2d 156, 165 (2009). Whether the one-act, one-crime doctrine has been violated is reviewed *de novo*. *Coats*, 2018 IL 121926, ¶ 12.

¶ 39     We agree with the parties that both of defendant's convictions are based on the same physical act, the possession of a single firearm. When, as here, there is a violation of the one-act, one-crime doctrine, the reviewing court should vacate the sentence imposed on the less serious offense. *Artis*, 232 Ill. 2d at 170.

¶ 40     Here, armed habitual criminal is a Class X offense (720 ILCS 5/24-1.7(a), (b) (West 2014)), and UUWF, in this case, is a Class 2 offense (720 ILCS 5/24-1.1(a), (e) (West 2014)). Therefore, UUWF is the less serious offense. See *Artis*, 232 Ill. 2d at 170 (when "determining which offense is the more serious, a reviewing court compares the relative punishments prescribed by the legislature for each offense," as greater punishment is mandated for the more serious offense). Under the circumstances of this case, the sentence imposed for UUWF must be vacated.

¶ 41     For these reasons, we vacate defendant's sentence for UUWF. We affirm the judgment of the trial court in all other respects.

¶ 42     Affirmed in part; vacated in part.