2020 IL App (1st) 181198-U

THIRD DIVISION
December 30, 2020

No. 1-18-1198

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 8429 |
| | ) | |
| SEAN McELRATH | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Affirmed. Counsel was not ineffective for failing to introduce FOID card of defendant's wife to support defense theory that guns seized during search were in wife's, not defendant's, possession. Error in prohibiting defense from eliciting testimony about defendant's "post-*Miranda* conduct" from officers was not plain error.

¶ 2    While searching a house owned, if not occupied at the time, by defendant Sean McElrath and his wife Susie, the police seized a shotgun, a .357 revolver, ammunition, and just shy of an ounce of cannabis. Defendant was charged with armed habitual criminal (AHC) and possession of cannabis with intent to deliver. At his trial, Susie testified that this contraband was hers: She used cannabis to treat chronic pain, and she was temporarily storing the guns as a favor to her mother-in-law. The jury found defendant not guilty of the cannabis charge but guilty of AHC.

¶ 3    Defendant raises two issues on appeal. First, he claims his attorney was ineffective for not introducing Susie's Illinois Firearm Owner's Identification (FOID) Card. This failure, he says, undermined Susie's credibility and weakened the defense theory that the guns were in her possession, not his.

¶ 4    Second, defendant argues that the trial court erred in ruling that the defense could not elicit testimony from the officers about his "post-*Miranda* conduct," as he calls it—a mix of silence and statement during which defendant asked for his lawyer, said "I've been through this sh-- before," and otherwise remained silent. See *Miranda v. Arizona*, 384 U.S. 436 (1966). This testimony, he says, would have cast doubt on another officer's testimony that he spontaneously admitted that the guns were his during the search. We find no basis for reversal and affirm.

¶ 5                                    BACKGROUND

¶ 6    On April 15, 2014, the police arrived with a warrant to search a house on South Green Street, on the far south side of Chicago. The details of this property were disputed at trial, other than the fact that defendant and Susie owned it. The Cook County Assessor's Office listed the property as a single-family home. The State argued that this and other facts showed that defendant and Susie resided at the property at the time of the search.

¶ 7    Susie testified otherwise. She said that they purchased the house in 2003 and lived there until early 2012, when they moved to Gary, Indiana. They maintained the house as a rental property until they "lost" it in late 2014. The house was carved up into three separate units—the main floor; the upstairs; and the basement—each with its own entrance, kitchen, and bathrooms. She acknowledged that this arrangement was illegal, and she claimed that the assessor's office knew about it and told them they were "in violation." At the time of the search, there was one tenant living upstairs, but the main floor unit—where the search was conducted—was vacant.

Susie would visit the property every couple of weeks, for purposes we will describe later. Defendant, who was handy, would tend to maintenance issues, as needed.

¶ 8    Whatever the truth may be, defendant was alone at the property when the police arrived. Sergeant McInerney testified that defendant came to the door when the officers knocked and announced. But defendant could not let them in, since he left the key to the security gate inside. Defendant offered to get the key, but for "safety reasons," Sergeant McInerney told him to stay put. Officers Kirner and Hayes went in through the back door. They handcuffed defendant, sat him down on a couch in the living room, and let the rest of the team in through the front door.

¶ 9    The officers searched a bedroom adjacent to the living room, where they found an open shelving unit. On one shelf, there was a loaded .357 revolver, next to several vials of defendant's prescription medicine, and atop several pieces of mail addressed to defendant, some of which were opened. The parties disputed whether it was junk mail, and whether it was viable proof of residency, but for reasons that will become clear, these are not questions that we need take up.

¶ 10    In the bedroom closet, the officers found a loaded shotgun, two boxes of ammunition, and another vial of defendant's prescription medicine.

¶ 11    In a basket on the shelving unit (but on a different shelf than the revolver), the officers found some bags of cannabis, later confirmed to weigh 25.4 grams. There was also a stash of empty sandwich bags. On a table in the living room, they found a small digital scale.

¶ 12    Upon finding the guns, Sergeant McInerney and Officer Zattair had a brief conversation on the topic of "safety." They spoke among themselves and did not address defendant, who was still sitting on the couch. Without any prompting from the officers, defendant interjected, "I was robbed at gunpoint in front of my house and I need—and I need those because you all ain't gonna do sh--." (The trial court had denied defendant's motion to suppress the statement, finding

that although defendant was in custody, the statement was spontaneous, and not the result of any police interrogation.)

¶ 13    Officers Zattair and Kirner drove defendant to the station. During the ride, Officer Zattair read defendant his rights. The defense called Officer Kirner to elicit that, after defendant was *Mirandized*, he asked for his lawyer, said, "I've been through this sh-- before," and otherwise remained silent. (The defense also tried to elicit this testimony from Sergeant McInerney, who was not in the car with them.) The trial court sustained the State's objections and barred any such testimony. The court reasoned that if the State may not elicit testimony about defendant's post-arrest silence, then the defense may not do so, either.

¶ 14    Susie testified that the cannabis was hers. She smoked two or three times a week, to ease her diabetic nerve pain and psoriatic arthritis. Although they no longer lived at the Green Street property, she kept most of her stash there to avoid having to take it to Gary. Once every couple of weeks, she would come by and take what she needed, measuring it out with the digital scale to regulate how much she was using. She never told defendant that she kept her cannabis there.

¶ 15    Venita Parrish was defendant's sister. Venita and Susie testified that the guns belonged to Venita's and defendant's brother, who had passed away a few months before the search. Before he died, their brother (whose name was not revealed) lived with their mother, Maxine Crawford, in the basement of her house, where he kept his guns in a safe. Sometime after his death, the family went through his belongings. They did not have the combination for the safe, but Venita's ex-husband broke into it. Maxine's grandchildren were scheduled to move into her basement, and now that the safe was broken, she insisted that the guns had to go.

¶ 16    Susie testified that she agreed to hold the guns temporarily and arranged to have Venita pick them up at the Green Street property. That way, she could store the guns in the vacant unit,

rather than at home. Defendant, who had prior felony convictions, would "hit the roof" if he knew there were guns in the house. So Susie took the guns to Green Street and put them in a bedroom closet. She never told defendant they were there. The police showed up before Venita did.

¶ 17 After arresting defendant, the officers turned the property over to Susie, who arrived during or shortly after the search. Susie acknowledged telling Sergeant McInerney that she had a FOID card when she spoke to him there. But beyond that, Susie never said anything about the guns or the cannabis, either to the police or the prosecution, in the three years that passed from defendant's arrest until his trial. Susie testified that she brought her FOID card with her to court, but it was in her purse, which she had to leave in the car.

¶ 18 Defendant did not testify. The parties stipulated that he had two qualifying convictions for the AHC charge.

¶ 19 After the jury found defendant guilty of AHC, post-trial counsel filed a motion for new trial. The motion alleged, as relevant here, that trial counsel was ineffective for not introducing Susie's FOID card. The motion included three exhibits. One was Susie's FOID card, issued to her at the Green Street address. Another was Susie's affidavit, attesting that she told trial counsel about her FOID card, but counsel never asked for it or otherwise followed up. Nor did counsel ever discuss trial strategy with Susie and defendant.

¶ 20 The third exhibit was a "Notice of Disclosure," tendered to counsel before trial, which recounted Sergeant McInerney's conversation with Susie at the time of the search. It stated—as Susie acknowledged on cross-examination—that she told Sergeant McInerney about her FOID card. The sergeant told her that defendant "cannot be in the same house as the guns," because he is a convicted felon. But if she had a FOID card, she should bring it to the station. She never did.

In fact, she never came to speak to the police at all. And the guns seized from the house were not registered to her.

¶ 21    The trial court denied the post-trial motion, finding, for various reasons, that producing Susie's FOID card at trial would not have changed the jury's verdict. Defendant was sentenced to 8 years in prison. This appeal followed.

¶ 22                                  ANALYSIS

¶ 23                        I. Failure to Introduce Susie's FOID card

¶ 24    Defendant first argues that trial counsel was ineffective for failing to produce Susie's FOID card. This failure, defendant says, weakened Susie's credibility and allowed the State to paint her as a liar. And it weakened the defense theory that the guns were in her (constructive) possession, not defendant's, because her FOID card was relevant to her "ownership" of the guns.

¶ 25    Defendant must satisfy the familiar deficiency and prejudice requirements of *Strickland v. Washington*, 466 U.S. 668 (1984). If he cannot demonstrate a reasonable probability that the verdict would have been different, if not for counsel's alleged failures, we may reject the claim based on this lack of prejudice alone, without passing judgment on the quality of counsel's representation. *Id.* at 697; *People v. Scott*, 2011 IL App (1st) 100122, ¶ 27.

¶ 26    We do so here. There is little or no chance that the jury would have acquitted defendant of AHC, if only counsel had produced Susie's FOID card. There are at least three reasons why.

¶ 27    First, according to Sergeant McInerney, defendant admitted that the guns were his. The sergeant's uncontradicted testimony, if believed by the jury, all but assured a guilty verdict on the AHC charge, whether or not Susie's FOID card was in evidence. (And if the jury believed the sergeant, it did not need to decide whether defendant lived at the Green Street property at the time, exercised control over the areas where the guns were found, or otherwise "constructively"

possessed the guns. See *People v. Brown*, 327 Ill. App. 3d 816, 826 (2002). So we need not explore these disputes, either.)

¶ 28     Defendant asserts, in so many words, that he made no such spontaneous, pre-*Miranda*, statement; that the sergeant was lying; and that the trial court deprived him of his right to mount this defense by introducing evidence of his "post-*Miranda* conduct." We will address this claim in due course. For now, to demonstrate prejudice on his ineffective-assistance claim, defendant must explain how putting Susie's FOID card into evidence may have led a reasonable juror to discredit the testimony from Sergeant McInerney on this critical, if not dispositive, point. The prospects for such an argument seem slim at best, and defendant does not even broach the topic in his brief.

¶ 29     Second, Susie's FOID card did not have significant probative value with respect to any disputed issue at trial. Defendant argues, for example, that Susie's FOID card was probative on the purported issue of her "ownership," and thus possession, of the guns.

¶ 30     Susie never claimed that she *owned* the guns. Her testimony, and the defense theory, was that the guns belonged to defendant's deceased brother and were in the process of being handed over to his sister, with Susie effecting the transfer on behalf of their mother and thus temporarily having the guns in her possession. That does not make Susie the "owner" of the guns. And whatever value her FOID card may have had on that question, had it been at issue, it certainly has little probative value on the questions actually raised by the defense in this case.

¶ 31     Defendant also argues that the failure to produce Susie's FOID card allowed the State to paint her as a "liar" and thus damage her credibility as a key defense witness. The State argued in closing that Susie lied about the arrangement with Venita and Maxine and lied about having anything to do with the guns, all to protect her husband. But the State never accused Susie of

lying about having a FOID card. Consider the prosecutor's questions:

Q:     Do you have a FOID card?

A:     Yes, I do.

Q:     Do you have it with you?

A:     Yes. It's in my wallet.

Q:     What State issued your FOID card, ma'am?

A:     Illinois.

Q:     And that was to the Green Street address, is that right?

A:     Yes.

The prosecutor's last two questions, in particular, implied that Susie *did* have a FOID card, one issued to her at the Green Street address—as indeed it was. (Susie's claim to have a FOID card was known to the State before trial and easily verified by law enforcement. Thus, as the question suggests, the prosecutor evidently knew that Susie had a FOID card.)

¶ 32     Rather, the State's point about Susie's FOID card was that she never showed it to the police, even after Sergeant McInerney advised her to do so. And that was part of the State's broader point that, despite her husband facing serious charges, despite claiming to have lawfully possessed the guns, and despite three years passing before trial, Susie never came forward to the police with this innocent explanation for the presence of the guns at their property. To this end, after eliciting Susie's testimony that she left her purse in the car, the State asked Susie questions like this one:

Q:     —as the wife of someone who is charged here with having the guns that you say are yours or you brought to the home, have you ever presented any sort of documentation to the police or the State's Attorney's office to explain how this all

happened?

A:     No.

In other words, Susie's testimony was not believable because it was a recent fabrication. If what she said was true, the State implied, she would (or should) have told the police long ago, and she would (or should) have produced her FOID card then.

¶ 33     We need not decide how damaging this line of impeachment may have been for Susie's credibility. The important point is that producing her FOID card for the first time at trial would not have rebutted the State's charge that her testimony was a recent fabrication.

¶ 34     Defendant points to the split verdicts as evidence that the jury believed Susie's testimony about the cannabis, and thus found her generally credible, but nonetheless rejected her testimony about the guns—no doubt, says defendant, because counsel failed to corroborate it with her FOID card.

¶ 35     This argument is based on no small amount of speculation. It is impossible to divine from the jury's verdicts how much, if any, of Susie's testimony the jury believed. For example, the jury could have found defendant guilty of AHC because he admitted that the guns were his, but not guilty on the cannabis charge because he did not make the same admission about the drugs, and because the jury did not think that the State otherwise proved a knowing possession of the cannabis beyond a reasonable doubt. In that circumstance, the jury may not have found *any* of Susie's testimony particularly credible. To be sure, there are other possibilities for making sense of the jury's verdicts (putting aside the ever-present possibility of jury nullification), but it suffices to say that the verdicts do not automatically imply any particular credibility findings about Susie. So we will leave the matter at that.

¶ 36    Third, Susie's testimony did not establish a complete defense to the AHC charge. To be guilty of that charge, defendant only needed to possess at least one of the two guns, not both. A juror who believed Susie's testimony may well have found that he did not constructively possess the shotgun (or the cannabis). But for reasons we will now explain, that same juror would also find it difficult, if not impossible, to avoid the conclusion that he possessed *the .357 revolver*. Thus, bolstering Susie's testimony with her FOID card—if it would have had that effect—still would not have changed the verdict.

¶ 37    Susie testified that she agreed to store the guns temporarily, to get them out of Maxine's house and out of the kids' path, until Venita could come pick them up. Susie took the guns to the vacant ground-floor unit at the Green Street property and put them in a bedroom closet. She was expecting Venita imminently, but before Venita arrived, defendant went to the property to tend to some maintenance tasks. And in short order, the police arrived with a search warrant.

¶ 38    When the police searched the property, they found *one* of the guns—the shotgun—in the bedroom closet, along with defendant's prescription medication. But the .357 revolver was not in the closet, where Susie said she left it. It was on an open shelf in the bedroom, with defendant's mail, some of which had been opened, and more of his medication.

¶ 39    Assuming, for the sake of argument, that the jury believed Susie, there seems to be only one rational inference that it could draw: Defendant took the .357 from the closet.

¶ 40    Who else could have put the .357 on that shelf? Not Susie, according to her testimony. (In any event, why *would* she, when she said the whole point was to keep the guns *away* from defendant, given his prior felony convictions? And is this a detail she might have innocently overlooked or misremembered? Not impossible, of course, but also not likely.) And not Venita, either; she had not yet made it to the Green Street property. That leaves only defendant.

¶ 41    Susie testified that the ground-floor unit was vacant and had a separate entrance from the occupied unit upstairs. Defendant was alone when the police arrived, and there was no evidence that anyone other than defendant had access to the unit since Susie dropped off the guns.

¶ 42    And it bears emphasis that the .357 was found on an open shelf with defendant's mail—his recent, *opened* mail—and medication. More of his medication was found in the closet, where the gun was said to be left without his knowledge or consent. In light of these facts, an inference that he took the .357 from the closet and put a loaded gun in an easily accessible location with his other personal effects was all but inevitable—if, that is, the jury credited Susie's testimony in the first place, as we are supposing it did.

¶ 43    Defendant's admission to Sergeant McInerney aside, this inference also establishes that he (constructively) possessed the .357. Whether or not Susie told him about the guns, he clearly knew they were present, and he intended to exercise control over the .357, albeit not necessarily the shotgun. See *People v. McCurine*, 2019 IL App (1st) 160817, ¶¶ 21-22 (AHC requires proof of knowledge and possession, either actual or constructive); *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992) (constructive possession present where defendant has "intent and capability to maintain control and dominion" over contraband).

¶ 44    Thus, however credible the jury may have found Susie, her testimony did not present a complete defense to the AHC charge. Susie may have possessed the guns, as she claimed, but defendant *also* possessed one of them. See *People v. Schmalz*, 194 Ill. 2d 75, 82 (2000) (two or more people may have "joint" possession of same item of contraband). At least that is what a rational juror would almost certainly conclude, if the juror found Susie credible and sought to reconcile her testimony with the other available evidence, namely, the officers' testimony and accompanying crime-scene photographs establishing where the guns were found.

¶ 45    To be clear, we are *not* saying that the jury made these findings or convicted defendant of AHC based on this theory of possession. Our point, again, is simply that these findings are all but inevitable *if* one believes Susie's testimony about her plans for the guns. Hence, there is little or no chance that producing Susie's FOID card would have changed the verdict, even if we assume that the FOID card would have bolstered her testimony.

¶ 46    For all these reasons, defendant has not shown that he was prejudiced by counsel's failure to introduce Susie's FOID card at trial. The ineffectiveness claim cannot prevail.

¶ 47                            II. Defendant's "post-*Miranda* conduct"

¶ 48    According to the testimony of Sergeant McInerney, defendant admitted the guns were his in an unprompted, pre-*Miranda* statement made during the search. Part of the defense strategy was to challenge the credibility of the sergeant's testimony and convince the jury that defendant made no such admission. To this end, the defense sought to elicit testimony from Sergeant McInerney, and later from Officer Kirner, about defendant's "post-*Miranda* conduct," as he calls it—namely, that after he was read his rights, defendant asked for his attorney, said "I've been through this sh-- before," and otherwise remained silent. The trial court barred the defense from eliciting any of this proposed testimony.

¶ 49    Defendant says that ruling was (plain) error, and it precluded him from presenting a key aspect of his defense—that Sergeant McInerney was lying about a pivotal, and damning, piece of evidence. In a nutshell, defendant wanted to argue that, because he had been arrested before, he already understood his rights, including his right to remain silent. And so he did not spontaneously admit guilt and would never have done so. Having been down this road—having been "through this sh-- before"—he knew better.

¶ 50    Two preliminary points. First, defendant received his *Miranda* warnings in the car, on the

way to the station, from Officer Zattair. Officer Kirner was in the car, but Sergeant McInerney was not. Thus, the sergeant had no personal knowledge of what defendant may or may not have said after his warnings, and he could not have testified to anything other than (double) hearsay statements, if any, that other officers made to him about what transpired in the car. So we can leave Sergeant McInerney aside. The only question is whether the defense should have been permitted to elicit this proposed testimony from Officer Kirner, whom the defense called as a witness primarily for this purpose.

¶ 51   Second, although the parties lump them together, there are two analytically distinct pieces of testimony that the defense sought to elicit. First, defendant invoked his right to remain silent, or more precisely, his right not to speak to the police without his lawyer, and said nothing about the guns or cannabis seized during the search. Second, at the same time, he *did* make a statement to the police: "I've been through this sh-- before." Whatever its import or intended use at trial— questions that are more subtle than they may seem at first glance—that statement was something beyond a mere invocation of his rights. So unlike the parties, we will separately analyze each piece of testimony.

¶ 52   We begin with defendant's invocation of his *Miranda* rights. Or, to put the point another way, his refusal to speak to the police—about the guns or cannabis—after he was read his rights. There is no dispute that the State would not have been allowed to elicit testimony about his post-arrest silence. *Doyle v. Ohio*, 426 U.S. 610, 618-19 (1976). The trial court evidently thought that *Doyle* applies equally to the defense: "You're going to try to bring out that after he was given his rights, he didn't say anything? How can you bring that out? The State couldn't bring it out. How could you bring it out?"

¶ 53   The rule of *Doyle* is a limitation on the prosecution, not the defense. *Miranda* warnings

are a prophylactic means of safeguarding the fifth-amendment right against self-incrimination. *Id.* at 617. Thus, "implicit" in the warnings is an "assurance" "that silence will carry no penalty." *Id.* at 618. If that assurance is to have any meaning, a defendant's post-arrest silence (or other invocation of his *Miranda* rights) cannot be used *against* him at trial. *Id.* In other words, it cannot be invoked by the prosecution for purposes adverse to the defense.

¶ 54   But when a *defendant* introduces the fact of his post-arrest silence at trial, for whatever benefit he may perceive, that fact is not being used *against* him. He is not, so to speak, violating his own right against self-incrimination. This constitutional guarantee is not, as the trial court evidently thought, a two-way street: Only the State, or a ruling in the State's favor, can violate it. A defendant, for his own part, is free to waive his constitutional protections if he perceives some strategic advantage in doing so. (It is rare that a defendant will find it to his advantage to tell the jury he refused to speak to the police, but this case happens to be one such example.) To the extent that the trial court barred defendant, on this basis, from eliciting evidence of his own post-arrest silence or his request for a lawyer, its ruling was clear and obvious error.

¶ 55   The State does not contend that *Doyle* is a limitation on the defense. It makes no attempt to defend the trial court's basis for the ruling. But we can affirm an evidentiary ruling on any basis that is supported by the trial record. *People v. Rudd*, 2020 IL App (1st) 182037, ¶ 61. And the State argues that anything defendant said after receiving his *Miranda* warnings—including his request for an attorney—was inadmissible as hearsay.

¶ 56   Hearsay is an out-of-court "statement"—which is to say, an "assertion" of fact—offered to prove the truth of the matter it asserts. Ill. R. Evid. 801(a), (c) (eff. Oct. 25, 2015).

¶ 57   In seeking to introduce the fact that he invoked his rights—by asking for his attorney and otherwise remaining silent after his warnings—defendant was not seeking to prove the truth of

any assertion. He was simply offering the statement to show that he made it. He did not need to demonstrate to the jury that he wanted a lawyer or wanted to remain silent, only that *he told the police he did*.

¶ 58     Invoking one's right to remain silent and demanding counsel is not hearsay but a verbal act carrying legal consequences, just as the verbal act of giving or refusing consent to the police to search one's premises is not hearsay. See *United States v. Moreno*, 233 F.3d 937, 940 (7th Cir. 2000). And just as the giving of *Miranda* warnings themselves is not hearsay. See *State v. Lassor,* 555 A.2d 339, 348 (R.I. 1989) ("The giving of *Miranda* admonitions is a verbal act. Testimony of a declarant who heard the *Miranda* admonitions is not introduced for the truth of the matter asserted but only to indicate that the words of admonition were given"); *State v. McClain,* 551 P.2d 806, 807–08 (Kan. 1976) ("Clearly the state was not attempting to prove the truth of the matter stated, *viz.*, the *Miranda* warnings. The evidence was offered for the purpose of establishing that the warnings were stated and explained to the defendant prior to the interview."). Such verbal statements "carry legal significance independent of the assertive content of the words used." *Moreno*, 233 F.3d at 940.

¶ 59     So the testimony that defendant invoked his rights to silence and counsel should have been allowed. It did not violate *Doyle*, as the trial court believed, nor was it hearsay, as the State now contends.

¶ 60     That brings us to the second piece of testimony, evidence that defendant, after invoking, told the police, "I've been through this sh—before." Defendant offered this evidence to show that he already knew his rights, even before he was *Mirandized*, and hence that he knew better than to spontaneously admit his crime to the police. Thus, the argument would go, the sergeant's testimony that defendant blurted out a spontaneous admission was not believable.

- 15 -

¶ 61    Was this a hearsay use of defendant's post-arrest statement? Defendant argues that even if it was, the statement was still admissible to rebut Sergeant McInerney's testimony that he had spontaneously confessed during the search. To this end, defendant cites *People v. Johnson*, 271 Ill. App. 3d 962, 965 (1992), for the proposition that an excited utterance may be impeached by the declarant's later inconsistent statement.

¶ 62    We can dispose of this argument quickly, on two grounds. First, we don't have enough detail about the precise circumstances of defendant's admission to determine whether it qualified as an excited utterance. Because the issue was not litigated below, the record is not adequately developed on this point. Second, even if defendant's admission that the guns belonged to him did, indeed, qualify as an excited utterance, his later statement that he had "been through this sh-- before" was not *inconsistent* with his admission. Inconsistent statements contradict each other—as in, defendant *admits* that the guns were his, and later *denies* that the guns were his. But defendant did not deny that the guns were his. His statements did not contradict one another.

¶ 63    Rather, defendant offered his post-arrest statement for a more subtle purpose. As we understand his argument, he wanted to prove his state of mind—that he already knew his rights, and that he knew better than to talk to the police—and then use that proof of his state of mind as the basis for an inference that he acted in a certain way, namely, that he did *not* admit anything to the police spontaneously, and Sergeant McInerny was lying.

¶ 64    Statements offered to prove the declarant's state of mind present some of the most vexed questions in all of hearsay law, questions that the briefs do not address in their full complexity. But we can leave these questions for another day, since the outcome of this case does not depend on them. To reiterate, the trial court erred in excluding any testimony that defendant invoked his *Miranda* rights. But even if we assume, for the sake of argument, that the trial court further erred

in excluding any testimony about his post-arrest statement, reversal is still not warranted. We say this because defendant could not prevail under either prong of plain-error review.

¶ 65    Initially, defendant says plain-error review is inappropriate, that his objections should be deemed properly preserved, even though he failed to raise this issue in a post-trial motion. We are sympathetic to his argument. It is one thing when the issue before us was the subject of a single, unargued objection at trial. A post-trial motion may well be necessary to give the trial court a full opportunity to address the defense's contentions in the first instance.

¶ 66    But here, the defense tried time and again to elicit the testimony at issue. The State lodged numerous objections. And the trial court sustained them all, without fail, even after extensive, pages-long colloquies with defense counsel about the matter at hand. Through it all, the trial judge believed—erroneously but in no uncertain terms—that the testimony was inadmissible under *Doyle*. After all these objections and sidebars, it feels unfair to say that defendant forfeited the issue because he didn't raise the issue for the tenth or twelfth time in a post-trial motion.

¶ 67    But at least since its decision in *People v. Enoch*, 122 Ill. 2d 176, 186 (1988), our supreme court has firmly insisted that trial errors must be raised in a post-trial motion, no matter if—or how many times—they were raised during the trial itself. See also *People v. Cregan*, 2014 IL 113600, ¶¶ 17-20. Defendant's sole citation to the contrary, *People v. Jones*, 81 Ill. 2d 1, 7 (1979), pre-dates *Enoch*. We are thus bound to treat this error as forfeited and review it under the plain-error rule. And under either prong of that rule, defendant cannot establish plain error.

¶ 68    First, the evidence on the AHC charge was not closely balanced. Defendant argues that it was, principally because "the verdict turned on the credibility of witnesses." We disagree. Let's assume, as we did in defendant's ineffective-assistance argument, that the jury believed Susie's

testimony. And let's assume that the excluded testimony, about defendant's invocation of his rights and his post-arrest statement, would have shaken the jury's confidence that he admitted anything to the police.

¶ 69     For reasons we have already discussed, even without that spontaneous admission, any rational juror would almost certainly find that defendant possessed the .357 revolver. Whether defendant admitted it or not, there was no other rational explanation for the location of that gun, given where Susie said she put it (in the closet) and where the police found it during the search (out of the closet and on a shelf, atop opened mail addressed to defendant). In other words, we can grant defendant *both* of the key elements of his defense, and yet an inference of possession, with respect to one of the guns, remains all but impossible to avoid. Evidence like that cannot reasonably be called closely balanced.

¶ 70     Defendant also asserts that the error denied him his "right to present a defense," and because this right is "a fundamental component of a fair trial," the second prong of the plain-error rule applies.

¶ 71     True, the trial court erred in excluding evidence that the defense sought to introduce. But a defendant is not automatically deprived of his constitutional right to present a defense any time the trial court erroneously excludes a piece of evidence that would have favored his case. That rule would collapse the necessary distinction, on which the United States Supreme Court has long insisted, between the vast run of ordinary evidentiary errors, and those few that are of genuine constitutional significance. See *Crane v. Kentucky*, 476 U.S. 683, 689 (1986) (noting the Court's "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts").

¶ 72     Take the error in *Crane*, cited here by defendant. In *Crane*, the trial court ruled that the

defense could not introduce *any* testimony—including from the defendant himself—describing the circumstances under which his custodial confession was obtained. *Id.* at 685-86. As a result of that ruling, he had *no* means of presenting his defense, namely, that the circumstances at issue rendered his confession, the principal evidence against him, inherently unreliable. *Id.* at 691. And that left him all but powerless to defend against the charge: A defendant who is thus "stripped of the power to describe to the jury the circumstances that prompted his confession" is "effectively disabled from answering the one question every rational juror needs answered: If [he] is innocent, why did he previously admit his guilt?" *Id.* at 689.

¶ 73    Unlike in *Crane*, defendant here was by no means powerless to argue his theory about the spontaneous admission to the jury. Recall, for example, that the State introduced (by way of stipulation) that defendant had been convicted of two previous qualifying felonies, part of the elements of proof for the AHC charge. So the jury already *had* evidence that defendant "had been through this sh-- before." And while the jury had not been told specifically that defendant invoked his right to counsel and silence, the jury certainly knew by omission that the State was not offering any *other* incriminating statements made by defendant, besides the spontaneous, voluntary one.

¶ 74    In a real sense, then, trial counsel already had the information needed to make this argument—the facts and the logical inferences that flowed from those facts. He'd been arrested at least twice previously (you can't be convicted if you're not first arrested), he thus knew his rights, and the State hadn't introduced any other incriminating statements from him—so it's not believable that he would have been so careless as to spontaneously admit his guilt in his house.

¶ 75    Would this argument have been stronger with the excluded evidence? Yes. But not so much, in our view, that we could plausibly conclude that defendant was denied a fair chance to

articulate this theory and defend himself against these charges. Defendant could have more or less articulated the same argument, either way.

¶ 76  Thus, the error in excluding this evidence was an ordinary evidentiary error, reversible as plain error in a closely balanced case (though this case was not), but not an error that implicates the sixth amendment, the basic fairness of the trial, or the second prong of the plain-error rule.

¶ 77  We would add here that if plain error did not apply and we instead applied a harmless-error analysis for a preserved issue, our outcome would be the same, for the reasons we have given above. The evidence against defendant was strong even without the spontaneous admission, and defendant could have argued essentially his same theory about that spontaneous admission with or without the excluded testimony.

¶ 78  Lastly, in light of our conclusions on the two issues defendant has raised, we reject his cumulative-error argument.

¶ 79                                    CONCLUSION

¶ 80  For these reasons, we affirm defendant's conviction.

¶ 81  Affirmed.